Susan Davis (*pro hac vice* forthcoming)
Olivia R. Singer (Calif. Bar No. 312770)
Kayla Morin (*pro hac vice* forthcoming)
COHEN, WEISS and SIMON LLP
909 Third Avenue, 12th Floor
New York, New York 10022-4869
Tel: (212) 563-4100
sdavis@cwsny.com
*Attorneys for Defendant SAG-AFTRA*

UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

-----------------------------------------------------------x

ALEXANDER DOUGLAS PLANK,

              *Plaintiff*,

    - v. -

SAG-AFTRA,

              *Defendant*.

-----------------------------------------------------------x

Case No.
25-cv-07523 (AB) (SSC)

**DEFENDANT SAG-AFTRA'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR EXPEDITED HEARING ON PRELIMINARY INJUNCTION**

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF CONTENTS.................................................................i

TABLE OF AUTHORITIES .......................................................... iii

PRELIMINARY STATEMENT .....................................................1

FACTS ...................................................................................2

    The 2025 Election...............................................................3

    The Voter's Guide and Instructions for SAG-AFTRA Election Candidates ................................................................4

    The Practice of Cropping Photographs in Prior SAG-AFTRA Elections .................................................................6

    The Instant Dispute..............................................................6

ARGUMENT ...........................................................................8

I.    PLAINTIFF HAS NOT SHOWN THAT HE IS ENTITLED TO THE "EXTRAORDINARY REMEDY" OF A TRO OR PRELIMINARY INJUNCTION. .................................................................8

    A.    Plaintiff has not established that he is likely to suffer irreparable harm.................................................................9

    B.    Plaintiff is not likely to succeed on the merits of his claims. .............10

        i.    Plaintiff is not likely to succeed on his disability claims. ........10

        ii.    Plaintiff is not likely to succeed on his constitutional claim.................................................................13

        iii.    Plaintiff is not likely to succeed on his intentional infliction of emotional distress claim. .................................14

    C.    The public interest and balance of equities weigh against injunctive relief. ................................................................15

II.    THE TRO IS PROCEDURALLY DEFECTIVE. .......................................17

i

III.    THE TRO IS MOOT. ....................................................................................18

IV.    AN EXPEDITED HEARING IS NOT WARRANTED. ..............................19

CONCLUSION..................................................................................................19

CERTIFICATE OF COMPLIANCE...................................................................21

Memorandum of Points and Authorities in Opposition to Plaintiff's Ex Parte Motion for Temporary Restraining Order

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Bass v. Cnty. of Butte*,
    458 F.3d 978 (9th Cir. 2006) ...............................................................13

*Birch Strategic Cap., LLC v. Tumarin*,
    No. 8:25-CV-01059-FWS-DFM, 2025 WL 2014213 (C.D. Cal. June 2, 2025) ...............................................................................................9

*Borodaenko v. Twitter, Inc.*,
    No. 22-CV-07226-AMO, 2024 WL 3908104 (N.D. Cal. Aug. 21, 2024)...10, 11

*Bradt v. T-Mobile US, Inc.*,
    No. 19-CV-07752-BLF, 2020 WL 1809716 (N.D. Cal. Feb. 28, 2020)............19

*Brennan v. Silvergate Dist. Lodge No. 50, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 503 F.2d 800 (9th Cir. 1974) ...........................15

*Caribbean Marine Servs. Co., Inc. v. Baldridge*,
    844 F.2d 668 (9th Cir. 1988) ..................................................................9

*Carnero v. Elk Grove Fin., LLC*,
    No. 16-CV-03606-BLF, 2016 WL 6873544 (N.D. Cal. Nov. 22, 2016)..........14

*Clay v. Pac. Bell Tel. Co.*,
    639 F. App'x 420 (9th Cir. 2016).........................................................12

*Cooley v. California Statewide L. Enf't Ass'n*,
    No. 2:18-CV-02961-JAM-AC, 2019 WL 331170 (E.D. Cal. Jan. 25, 2019)...............................................................................................17

*Crosland v. Earle*,
    No. 2:24-CV-06277-AB-PVC, 2024 WL 4468002 (C.D. Cal. Aug. 14, 2024)...............................................................................................18

*Election Integrity Project California, Inc. v. Padilla*,
    No. 221CV00032ABMAAX, 2021 WL 3828457 (C.D. Cal. Jan. 11, 2021)...............................................................................................8

*Fisher v. United States*,
  No. SACV146499DOCKESX, 2016 WL 11520616 (C.D. Cal. Nov. 23, 2016) ............................................................................................... 15

*Gamboa v. Cnty. of San Luis Obispo*,
  No. 2:25-CV-04339-AB-MBK, 2025 WL 1722106 (C.D. Cal. May 22, 2025) ................................................................................................ 10

*Garity v. APWU Nat'l Lab. Org.*,
  840 F. App'x 924 (9th Cir. 2020) ....................................................... 11

*Ma v. Stripe Inc.*,
  No. C25-0864-KKE, 2025 WL 2052634 (W.D. Wash. July 22, 2025) ............. 10

*Macnab v. Gahderi*,
  No. CV0904498DDPRZX, 2009 WL 10671026 (C.D. Cal. July 28, 2009) ...... 16

*O'Handley v. Weber*,
  62 F.4th 1145 (9th Cir. 2023) ............................................................ 14

*Pom Wonderful LLC v. Hubbard*,
  775 F.3d 1118 (9th Cir. 2014) ............................................................. 9

*Reno Air Racing Ass'n., Inc. v. McCord*,
  452 F.3d 1126 (9th Cir. 2006) ............................................................. 9

*Rodney v. Toyota Motor Credit Corp.*,
  No. 5:24-CV-02202-AB, 2024 WL 5338656 (C.D. Cal. Nov. 20, 2024) .......... 17

*Sinacore v. Robinson*,
  No. 2:25-CV-03251-MRA-PVC, 2025 WL 2087554 (C.D. Cal. June 20, 2025) ......................................................................................................... 18

*Singh v. IKEA Distribution Servs., Inc.*,
  No. 120CV0975NONEJLT, 2021 WL 1907608 (E.D. Cal. May 12, 2021) ...... 15

*Tecnogruas v. Int'l Transportation Serv., LLC*,
  No. 2:24-CV-05984-AB-PVC, 2024 WL 5372408 (C.D. Cal. Nov. 8, 2024) ............................................................................................ 8, 9, 17

*Vegas Diamond Props., LLC v. F.D.I.C.*,
  669 F.3d 933 (9th Cir. 2012) ............................................................. 19

*Whitehead v. Pacifica Senior Living Mgmt. LLC, No. 21-15035,*
2022 WL 313844 (9th Cir. Feb. 2, 2022) ..........................................11

*Williams v. United Airlines, Inc.,*
830 F. App'x 242 (9th Cir. 2020).....................................................12

*Winter v. Nat. Res. Def. Council,*
555 U.S. 7 (2008).......................................................................9, 10, 15

*Wirtz v. Local 153, Glass Bottle Blowers Ass'n,*
389 U.S. 463 (1968)........................................................................16

*Wright v. Serv. Emps. Int'l Union Loc. 503,*
48 F.4th 1112 (9th Cir. 2022) .........................................................14

**Other State Cases**

*Bassam v. Bank of Am.,*
No. CV 15-00587 MMM FFMX, 2015 WL 4127745, at *8 (C.D. Cal.
July 8, 2015) ..........................................................................14, 15

*Miller v. Sacramento City Unified Sch. Dist.,*
No. 221CV0757JAMCKDPS, 2021 WL 4806860 ...........................12

**Federal Statutes**

29 U.S.C. 481(c) ...................................................................................11

29 U.S.C.
§ 481 *et seq.* ...................................................................................3
§ 483 ...............................................................................................16

42 U.S.C.
§ 1983 .............................................................................................13
§ 12117(a).......................................................................................12
§ 12101 *et seq.* ................................................................................10

**California Statutes**

Cal. Civ. Code
§ 54(a).....................................................................................10, 13

Cal. Gov. Code
§ 12965(c).......................................................................................12

v

Cal. Gov't Code
    § 12900 *et seq.* ................................................... 10

**Other Authorities**

29 C.F.R. § 452 *et seq.* ............................................... 3

29 C.F.R. § 452.67 ................................................ 4, 6

29 C.F.R. § 452.69 ................................................ 4, 6

29 C.F.R. §§ 452.135–136 ............................................ 16

Fed. R. Civ. P. 5 .................................................. 18

Local Rule 5-3.2.1 ................................................. 18

Local Rule 7-19 .................................................... 17

Local Rule 7-19.1 .................................................. 17

Local Rules 7-19 and 7-19.1 ........................................ 17

*Headshot*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/
    dictionary/headshot (last visited Aug. 15, 2025). Article 1.K ............................ 5

Memorandum of Points and Authorities in Opposition to Plaintiff's Ex Parte Motion for Temporary Restraining Order

## PRELIMINARY STATEMENT

This action challenges and seeks to enjoin a decision made by a union, SAG-AFTRA, in the middle of a national union election, a matter generally within the exclusive jurisdiction of the United States Department of Labor. Plaintiff claims that by cropping his photo in the Voter's Guide that is mailed to eligible voters so that only a headshot appears — as it does with every other photo submitted and in accordance with Department of Labor regulations and SAG-AFTRA policies — SAG-AFTRA violated the Americans with Disabilities Act, the Fourteenth Amendment to the U.S. Constitution, the California Disabled Persons Act, and the California Fair Employment and Housing Act, and intentionally inflicted emotional distress on him. As discussed below, these claims are baseless.

The facts underlying Plaintiff's claims are undisputed. SAG-AFTRA has maintained an unbroken practice in its last six biennial elections of only including headshots, together with 100-word candidate statements, in its Voter Information Guide ("Voter's Guide"). Its practice, approved by the Los Angeles Local Union ("LA Local") Election Committee and uniformly applied, is clearly explained to candidates in advance. The LA Local Voter's Guide, which is paid for by SAG-AFTRA, contains more than 100 identically sized statements and photos of candidates running in the national and LA Local election. SAG-AFTRA pays for the printing and mailing of the Guide to supplement candidate mailings and e-mailings that are paid for by individual candidates.

The requirement of maintaining uniformity in the type and size of candidates' photos is necessary to ensure that all candidates are treated equally, a requirement of Title IV of the Labor-Management Reporting and Disclosure Act ("LMRDA") when a union pays for a campaign mailing. When candidates submit photographs that contain more than their headshots, which occurs quite frequently, SAG-AFTRA crops the photographs so that they only contain a headshot, as required in the candidate instructions. Plaintiff claims that SAG-AFTRA acted

1

discriminatorily in removing his service animal and only including his headshot in his photograph.  Essentially, Plaintiff seeks to compel SAG-AFTRA to act contrary to its obligations under Title IV of the LMRDA and its own governing documents by treating *him* differently from every other candidate.

Notwithstanding the procedural improprieties of Plaintiff's Ex Parte Motion for Temporary Restraining Order ("TRO") and for Expedited Hearing on Preliminary Injunction (the "Motion"), Plaintiff has failed to satisfy the extremely high threshold for the issuance of a TRO.  Not only is Plaintiff unlikely to succeed on the merits of any of his claims, but he is unable to demonstrate that he has suffered irreparable harm.  Additionally, as the Voter's Guide was mailed on August 13th, the relief he seeks — enjoining the mailing of the Voter's Guide — is moot and incapable of being effectuated.  Thus, for the reasons discussed below, Plaintiff's application for a TRO should be denied.

## FACTS

SAG-AFTRA, a national labor organization representing more than 160,000 members, was formed on March 30, 2012 as a result of the merger of the Screen Actors Guild ("SAG") and the American Federation of Television and Radio Artists ("AFTRA").  *See* Declaration of Michelle Bennett ("Bennett Decl.") ¶ 3.  SAG-AFTRA's members include actors, broadcasters, recording artists, and other media professionals across the United States.  *Id.* ¶ 3.

Plaintiff, Alexander Douglas Plank, is a member of SAG-AFTRA's LA Local.  *Id.* ¶ 5. Plaintiff is running for a seat on the LA Local Board, as well as for a Convention Delegate position, in the 2025 SAG-AFTRA LA Local election (the "2025 Election").  *Id.*; *see also* Compl., Dkt. 1 at 14.[1]

---

[1] All citations to page numbers refer to the pagination of the PDF.

The 2025 Election

SAG-AFTRA is in the final stages of conducting an internal election for national officers, national Board members, local officers, local Board members, and Convention Delegates.  Bennett Decl. ¶ 4.  This is the seventh regularly scheduled biennial election that SAG-AFTRA has held since the 2012 merger of SAG and AFTRA.  *Id.*  The elections are being conducted by an independent election firm, Integrity Voting Systems ("IVS").  *Id.*  Michelle Bennett, Chief Governance and Equity & Inclusion Officer ("Bennett"), is responsible for the internal administration of the election. *Id.* ¶¶ 2, 4.  Her election duties include overseeing the mechanics of the national and 25 affiliated Local elections, supervising the preparation of the Voter Information Guide ("Voter's Guide"), and coordinating the elections balloting and tabulations with IVS.  *Id.* ¶ 4.  The LA Local Election is also overseen by the LA Local Election Committee, a five-member committee appointed by the LA Local Board.  *Id.* ¶ 5.

The election period in the LA Local began on May 9, 2025, when SAG-AFTRA sent its "Calling all Candidates" notice of nominations and election to all members of the LA Local.  *Id.* ¶ 7, Exhibit ("Ex.") B.  The nominating period closed on July 11, 2025.  *Id.*  On August 13, 2025, IVS mailed ballots to the LA Local's 56,567 eligible members. *Id.*  The Voter's Guide, discussed in detail below, went to print on August 8th and was included in the ballot package mailed to eligible members on August 13th.  *Id.*  The ballots will be counted on September 12, 2025.  *Id.*, Ex. B at 2.

Internal union elections are highly regulated by the United States Department of Labor ("DOL"), which has exclusive jurisdiction over virtually all disputes concerning these elections.  29 U.S.C. § 481 *et seq.* ("Title IV").  On March 15, 2025, consistent with the requirements of Title IV and its extensive accompanying regulations, 29 C.F.R. § 452 *et seq.*, the SAG-AFTRA National Board adopted a Nominations and Election Policy (the "Election Policy") that

contained the specific rules governing the 2025 Election. Bennett Decl. ¶ 8, Ex. C. The Election Policy, as well as a comprehensive set of candidate instructions, was posted on SAG-AFTRA's website on May 8, 2025. *Id.*, Ex. D.   The Calling All Candidates Notice also notified all candidates that additional requirements for the submission of materials would be described online. *Id.*

The Voter's Guide and Instructions for SAG-AFTRA Election Candidates

DOL Regulations and the Election Policy give candidates the right to mail or email campaign literature to all eligible voters at their own expense.  29 C.F.R. §§ 452.67–69; Election Policy Article III.B.  Additionally, although not required by Title IV or its regulations, SAG-AFTRA incurs the cost of distributing to the eligible voters a Voter's Guide, which contains a headshot and 100-word statement from each candidate.  Bennett Decl. ¶ 6.  For the 2025 Election, SAG-AFTRA spent more than $130,000 on printing and mailing the Voter's Guide. *Id.*

Where, as here, a union "distributes any candidate's literature without charge . . . , all other candidates are entitled to have their literature distributed *on the same basis*." 29 C.F.R. § 452.69 (emphasis added).  To ensure that all candidates who submit statements and photos for the Voter's Guide are treated equally, the Election Policy contains strict rules for the size and format of each candidate's statement and photograph.  With respect to the statement, Article III.A.1.b of the Election Policy provides, in relevant part:

b) Candidate Statements

> Candidates may submit a statement in a single paragraph form of not more than one hundred (100) words that will be published, together with the candidate's photo, in the Guide. Candidates' statements and photos will be listed in the Guide in the same order as they appear on the ballot. The Guide shall contain a statement that all candidates were afforded the right to submit statements and photos in accordance with this Nominations and Election Policy . . . .

4

Election Policy Article III.A.1.b.

Article III.A.1.a of the Election Policy, which concerns candidate photographs to be included in the Voter's Guide, provides, in relevant part:

a) Photos

> 1. Non-Convention Delegate candidates may submit a campaign photo for use in the Voter Information Guide (the "Guide") that will be distributed by SAG-AFTRA to members in good standing together with the mail ballots. Candidates seeking to have their photos used in the Guide must sign a photo release and indemnification form. *Photos submitted for the Guide must be of the candidate running*, and must be in the form of a photograph and not an illustration of any kind. Further, political messaging may not be included.

*Id.* at Article III.A.1.a (emphasis added).

The Instructions for SAG-AFTRA Election Candidates ("Candidate Instructions"), which are posted on SAG-AFTRA's website, provide more specific directions to candidates about their statements and photos in order to ensure that there is no disparity in how candidates are being treated in the union-funded publication.  Bennett Decl. ¶ 8, Ex. D.  With respect to photos, Article 1.K of the Candidate Instructions requires that candidates submit a "headshot," which is defined as "a photograph of a person's head and face."  *Headshot*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/headshot (last visited Aug. 15, 2025).  Article 1.K states:

K.    Photo/Headshot

> i. Candidates running for National Board, Local Officer, Local Board or Convention Delegate seats may submit a photo/headshot for the voter's guide (an electronic jpeg format with a resolution greater than 200 dpi is preferred)….

> ii. One (1) photo/headshot for all positions in the voter's guide may be submitted through the online

nominating portal or offline by email to
laelections@sagaftra.org.

iii. Candidates must supply a new photo/headshot (not an illustration) for the voter's guide even if you have previously provided a photo/headshot in connection with former elections or for other SAG-AFTRA purposes.

Candidate Instructions Article 1.K.

To comply with Title IV's requirements that all candidates be treated "equally" and "under the same conditions," 29 C.F.R. §§ 452.67, 452.69, the Candidate Instructions which provide that all photos contain only a headshot of the candidate, and Article III.A.1 of the Election Policy which allows for a photo "of the candidate running," both IVS and SAG-AFTRA staff crop all candidate photographs to a uniform size that includes only a headshot.  Bennett Decl. ¶ 12. This cropping practice was approved by the LA Local Election Committee on August 7, 2025.  *Id.* ¶ 12, Ex. E.

<u>The Practice of Cropping Photographs in Prior SAG-AFTRA Elections</u>

In the six prior biennial elections held since the 2012 merger of SAG and AFTRA, SAG-AFTRA's Election Policy and Candidate Instructions required that all candidate photographs contain only a headshot of the candidate running. *Id.* ¶ 13.  Consistent with this, both IVS and SAG-AFTRA staff have cropped thousands of candidate photographs to ensure that they contain only a headshot of the candidates.  *Id.*  Notably, as occurred here, in the 2017, 2019, 2021, and 2023 elections, one candidate, Joanna Leeds, who submitted a photograph with her dog had her photograph cropped to remove the dog and include only her headshot.  *Id.*, Exs. F–J.

<u>The Instant Dispute</u>

On August 8, 2025, Plaintiff wrote to Bennett and expressed his displeasure with the fact that his service animal would not appear in his photograph.  *Id.* ¶ 14, Ex. K.  Plaintiff stated that he had "hoped to use [his]

6

position on the board to advocate for disabled performers, especially those with service animals." *Id.*; Ex. K.  Plaintiff's 100-word statement, however, which accompanied his photograph in the Voter's Guide, clearly set forth his position on this issue:

> Once elected, I will be the only member of leadership with a service dog.  As an autistic actor and disability rights activist, I have a passion for improving things for marginalized performers.  Having served as a strike captain and on the performers with disabilities and communications committees, I'm excited to continue to work to bring SAG-AFTRA into the modern era by increasing our union organizing efforts, building solidarity, and improving future negotiations so that our members have opportunities in a rapidly changing world.
> **TheCoalition2025.org**

Ex. A; *see also* Compl., Dkt. No. 1 at 14.  Additionally, the link in his statement was to a website that included a photograph of Plaintiff *with his service animal*. *Id.*

Bennett sent Plaintiff an email less than an hour later, stating:

> Thank you for reaching out to me. I want to assure you that the Union does not stand for disability erasure and that the photo was cropped only to align with SAG-AFTRA's Nominations & Election Policy and the candidate instructions which specify that all photos submitted for the voter's guide must be a headshot of the candidate. . . .
>
> We are always open to suggestions for improving the Union's rules and policies.  We will certainly add this to the list of recommendations to be considered and approved for future election cycles.

Bennett Decl. ¶ 15, Ex. K.  Plaintiff wrote back to Bennett later that day, again protesting the cropping of his service animal from his photograph and asking when the Voter's Guide was being mailed.  *Id.*  Bennett advised Plaintiff on August 12, 2025 that the Voter's Guide was being mailed the next day, and stated:

> [T]he photo was cropped only to align with SAG-AFTRA's Nominations & Election Policy and the

7

candidate instructions, which specify that all photos submitted for the Voter's Guide must be a headshot of the candidate.  All candidate photos have been cropped to comply with this Rule. The Election Committee does not have the authority to make any exceptions to the rules set forth in the SAG-AFTRA Nominations and Election Policy; it only has the authority to determine whether the candidate requirements have been met.

SAG-AFTRA mailed the Voter's Guide to the more than 50,000 LA Local eligible voters beginning at 12:24 p.m. Pacific Time on August 13, 2025, with the last delivery taking place at 3:27 p.m.  *Id.* ¶ 16.  That afternoon, via an email Plaintiff sent at 4:47 p.m., SAG-AFTRA learned of this action.  *Id.*; Ex. L.

## ARGUMENT

## I.    PLAINTIFF HAS NOT SHOWN THAT HE IS ENTITLED TO THE "EXTRAORDINARY REMEDY" OF A TRO OR PRELIMINARY INJUNCTION.

A TRO is "'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'"  *Tecnogruas v. Int'l Transportation Serv., LLC*, No. 2:24-CV-05984-AB-PVC, 2024 WL 5372408, at *2 (C.D. Cal. Nov. 8, 2024) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008)).  The standard for issuing a TRO is the same as that for a preliminary injunction.  *Id.*  Specifically, a movant must show (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest.  *Id.* (quoting *Winter*, 555 U.S. at 20).  Where, as here, a movant seeks a TRO on an ex parte basis,[2] he faces an "exceedingly high burden."  *Election Integrity Project California, Inc. v. Padilla,* No. 221CV00032ABMAAX, 2021 WL 3828457, at *1 (C.D. Cal. Jan. 11, 2021).  There are "very few circumstances justifying the

---

[2] Plaintiff styles his application as an "ex parte motion for temporary restraining order and for expedited hearing on preliminary injunction."  Dkt. No. 4 at 1.

8

issuance of an ex parte TRO." *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006).

> ### A.    Plaintiff has not established that he is likely to suffer irreparable harm.

A showing of irreparable harm is the "'single most important prerequisite for the issuance'" of a TRO. *Birch Strategic Cap., LLC v. Tumarin*, No. 8:25-CV-01059-FWS-DFM, 2025 WL 2014213, at *2 (C.D. Cal. June 2, 2025). Here, in large part because Plaintiff clearly explained his views on disability rights in his 100-word statement and linked that statement to a picture of himself with his service animal, Plaintiff's vague allusions to the harm he will suffer fail to support a showing of any injury, let alone "irreparable injury [that] is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.

The test for irreparable harm is stringent: "A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co., Inc. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988). To put a finer point on it, a plaintiff seeking a TRO "must establish a likelihood of irreparable harm that is grounded in evidence, not in conclusory or speculative allegations of harm." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1132–33 (9th Cir. 2014) (citation omitted).

Plaintiff's threadbare assertion that he will suffer "irreparable dignitary, reputational, and emotional harm" does not meet this demanding test. Compl., Dkt. No. 1, at 3, ¶ 11. Plaintiff offers no evidence or explanation as to how the distribution of the Voter's Guide will cause him harm beyond conclusory, speculative statements. *See Tecnogruas v. Int'l Transportation Serv., LLC*, No. 2:24-CV-05984-AB-PVC, 2024 WL 5372408, at *3 (C.D. Cal. Nov. 8, 2024) (holding that plaintiff failed to establish irreparable harm flowing from the inclusion of his business in a publication where he offered "no evidence" as to "the

9

extent and likelihood of reputational damage beyond short and undetailed assertions"); *Ma v. Stripe Inc*., No. C25-0864-KKE, 2025 WL 2052634, at *1 (W.D. Wash. July 22, 2025) (noting that a "vague allegation of emotional distress is insufficient to demonstrate irreparable harm").

Plaintiff's conclusory assertions of irreparable harm do not justify the extraordinary remedy of a TRO.  As such, his application for a TRO should be denied.

**B.    Plaintiff is not likely to succeed on the merits of his claims.**

A plaintiff seeking a TRO must also establish that he has a likelihood of success on the merits of his claims.  *See Winter*, 555 U.S. at 20.  Where, as here, a plaintiff has not made the "minimum showing" of irreparable harm, a court need not assess the merits of his claims.  *Gamboa v. Cnty. of San Luis Obispo*, No. 2:25-CV-04339-AB-MBK, 2025 WL 1722106, at *2 (C.D. Cal. May 22, 2025) (citing *Oakland Tribune, Inc. v. Chronicle Publ'g Co*., 762 F.2d 1374, 1378 (9th Cir. 1985)).  In any event, Plaintiff's claims are likely to fail on the merits as well.

*i.    Plaintiff is not likely to succeed on his disability claims.*

Plaintiff has not shown that he is likely to succeed on the merits of his disability claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12900 *et seq.*, or the California Disabled Persons Act ("CDPA"), Cal. Civil Code § 54 *et seq*.

Courts apply the familiar *McDonnell Douglas* burden-shifting framework to disability discrimination claims under both the ADA and the FEHA. *See Borodaenko v. Twitter, Inc*., No. 22-CV-07226-AMO, 2024 WL 3908104, at *4 (N.D. Cal. Aug. 21, 2024).  Accordingly, to establish a *prima facie* case of discrimination under either statute, a plaintiff must show that "'[he] (1) is disabled; (2) is qualified; and (3) suffered an adverse employment action because of [his]

10

disability.'" *Garity v. APWU Nat'l Lab. Org.*, 840 F. App'x 924, 927 (9th Cir. 2020) (affirming grant of summary judgment to union on member's ADA claims) (citation omitted).  The third element requires, at a minimum, facts giving rise to an inference that a defendant "'had a discriminatory intent or motive'" in taking an adverse action against the plaintiff.  *Borodaenko*, 2024 WL 3908104, at *4 (quoting *Watson v. Forth Worth Bank & Tr.*, 487 U.S. 977, 986 (1988)).

Plaintiff's disability claims are unavailing because he fails to include a single fact tending to show that SAG-AFTRA treated him less favorably than any non-disabled, similarly situated person.  *See Garity*, 840 F. App'x at 927 (the plaintiff's disparate treatment claim failed because she offered no evidence of direct discrimination or evidence that she was treated less favorably); *see also Whitehead v. Pacifica Senior Living Mgmt. LLC, No. 21-15035*, 2022 WL 313844, at *2 (9th Cir. Feb. 2, 2022) (affirming dismissal of disability discrimination claim where there was no evidence that the plaintiff was "singled out and treated less favorably than others similarly situated" (cleaned up)).

To the contrary, SAG-AFTRA applied its neutral, uniformly applicable headshot policy to all candidates in accordance with its internal policy, Candidate Instructions, and obligation to afford all candidates "equal treatment" under Title IV of the LMRDA .  29 U.S.C. 481(c).[3]  SAG-AFTRA's Election Policy and Candidate Instructions allow for the submission of a "headshot" of the candidate running; they do not allow a candidate to appear in a full or partial body pose, submit an illustration in lieu of a photograph, or appear with another person or animal.  Pursuant to this policy, on four separate occasions over the last four election cycles, SAG-AFTRA cropped a photo provided by a candidate that

---

[3] While Plaintiff claims that the Voter's Guide includes one other "nonstandard" photograph, he does not allege how that photograph is "nonstandard" or even direct the Court to the photograph itself.  Compl., Dkt. No. 1, at 3, ¶ 8.

included her dog to include only her headshot.  Bennett Decl. ¶ 13, Exs. F–J.

SAG-AFTRA's unbroken practice is to crop all photos that do not comply with its

headshot requirement.  *Id.* ¶ 13.  Under these circumstances, SAG-AFTRA's

legitimate, non-discriminatory reason for cropping Plaintiff's photograph —

ensuring that it adhered to federal labor law and that its election policies were

applied equally to all candidates — readily defeats Plaintiff's discrimination

claims.  *See Williams v. United Airlines, Inc*., 830 F. App'x 242, 243 (9th Cir. 2020)

(noting that even if the plaintiff could establish a *prima facie* case of disability

discrimination, summary judgment was warranted because the employer

articulated "legitimate, non-discriminatory reason" for his discharge).

Additionally, aside from the substance of Plaintiff's ADA and FEHA

claims, this Court lacks jurisdiction based on his failure to exhaust his

administrative remedies.  The ADA requires complainants to first file a charge with

the Equal Employment Opportunity Commission ("EEOC"), 42 U.S.C. § 12117(a);

FEHA likewise requires complainants to submit a complaint with a California

administrative agency before filing a lawsuit, Cal. Gov. Code § 12965(c).  Because

Plaintiff has failed to exhaust his administrative remedies, his ADA and FEHA

claims fail.  *See Clay v. Pac. Bell Tel. Co*., 639 F. App'x 420, 422 (9th Cir. 2016)

(dismissal of FEHA claims against union was proper where the plaintiff failed to

exhaust administrative remedies); *Miller v. Sacramento City Unified Sch. Dist*., No.

221CV0757JAMCKDPS, 2021 WL 4806860, at *13 (E.D. Cal. Oct. 14, 2021

(court lacked subject matter jurisdiction over ADA claims where the plaintiff did

not name union in EEOC complaint), *report and recommendation adopted*, No.

221CV0757JAMCKDPS, 2021 WL 5165918 (E.D. Cal. Nov. 5, 2021).

Plaintiff's CDPA claim likewise fails because the CDPA applies to

disabled individuals' access to public accommodations, not to a union's election

materials or a dispute between a labor organization and its members.  For example,

in support of his CDPA claim, Plaintiff cites to Section 54, which outlines a general

1    right for disabled individuals to access public places.  *See* Cal. Civ. Code § 54(a).

2    SAG-AFTRA's Voter's Guide is not akin to the types of "public accommodations"

3    that fall within the scope of the CDPA.  *Cf. Bass v. Cnty. of Butte*, 458 F.3d 978,

4    980 (9th Cir. 2006) (the CDPA focuses on "ensuring that persons with disabilities

5    have equal access to public businesses, facilities, and other accommodations").

6    Plaintiff also cites to Section 54.2, which gives individuals with disabilities the

7    "right to be accompanied by a guide dog" in the places enumerated in Section 54.1.

8    *Id.* § 54(a).  The places enumerated in Section 54.1 include public accommodations

9    and common carriers such as hospitals, airplanes, schools, hotels, and "other places

10   to which the general public is invited."  *Id.* § 54.1(a).  Nowhere does the statute

11   remotely indicate that an individual with a disability has the right to be featured

12   with a service animal in union election materials.

13           Finally, it is crucial to keep in mind the context of Plaintiff's disability

14   claims, which arise out of a disagreement with SAG-AFTRA's internal union

15   election procedures.  Plaintiff's cries of discrimination are, in reality, a request that

16   SAG-AFTRA treat *him* differently from other candidates.  He wants his headshot

17   to include an image of his dog, even though SAG-AFTRA's Election Policy only

18   permits candidate headshots and SAG-AFTRA has scrupulously applied that rule

19   evenhandedly.  Such disparate treatment is precisely what SAG-AFTRA may not

20   do under Title IV and its own internal documents.

21           For the above reasons, Plaintiff has not shown that he is likely to

22   succeed on his disability discrimination claims.

23           ii.     *Plaintiff is not likely to succeed on his constitutional claim.*

24           Plaintiff will not succeed on his Equal Protection Claim brought under

25   42 U.S.C. § 1983 because SAG-AFTRA is a private entity not subject to the

26   Constitution's strictures.  Plaintiff does not, and could not, argue that SAG-AFTRA

27   was acting under color of state law when it created and distributed the Voter's

28

13

Guide.  *See Wright v. Serv. Emps. Int'l Union Loc. 503*, 48 F.4th 1112, 1122 (9th Cir. 2022) (holding that union was not a state actor under § 1983 where it provided a list of employees who had authorized dues deductions to state agency); *see also O'Handley v. Weber*, 62 F.4th 1145, 1156–57 (9th Cir. 2023) (Twitter not acting as a state actor in applying its content-moderation policies to plaintiff's speech).

Like his disability discrimination claims, Plaintiff's constitutional claim against SAG-AFTRA is meritless.

> iii.   *Plaintiff is not likely to succeed on his intentional infliction of emotional distress claim.*

Plaintiff is not likely to succeed on the merits of his common-law intentional infliction of emotional distress ("IIED") claim.[4]  To set forth a *prima facie* case of IIED under California law, a plaintiff must show the following: "(1) extreme and outrageous conduct by the defendant; (2) with the intention of causing, or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by defendant's outrageous conduct." *Bassam v. Bank of Am.*, No. CV 15-00587 MMM FFMX, 2015 WL 4127745, at *8 (C.D. Cal. July 8, 2015) (internal citations and quotations omitted).

Plaintiff's assertion that SAG-AFTRA published a headshot of him without his service dog is insufficient to meet the exceptionally high threshold to establish an IIED claim, which requires conduct "so extreme as to exceed all bounds of that usually tolerated in a civilized society."  *Id.* at *10 (internal citations and quotations omitted).  Courts have held that conduct of a much more extreme

---

[4] Because Plaintiff's federal law claims fail, the Court should decline to exercise supplemental jurisdiction over his state-law claims.  *See Carnero v. Elk Grove Fin., LLC*, No. 16-CV-03606-BLF, 2016 WL 6873544, at *3 (N.D. Cal. Nov. 22, 2016) (denying TRO where the plaintiffs had not demonstrated a likelihood of success on the merits of their federal claim and declining to exercise supplemental jurisdiction over state-law claims).

nature than that at issue here does not suffice for an IIED claim. *See, e.g.*, *Singh v. IKEA Distribution Servs., Inc*., No. 120CV0975NONEJLT, 2021 WL 1907608, at *7 (E.D. Cal. May 12, 2021) (termination of plaintiff, "even if improperly motivated by his disability and leave" not sufficient to support IIED claim), *report and recommendation adopted*, No. 120CV0975NONEJLT, 2021 WL 6775890 (E.D. Cal. June 16, 2021); *Fisher v. United States*, No. SACV146499DOCKESX, 2016 WL 11520616, at *3 (C.D. Cal. Nov. 23, 2016) (finding that delay in providing medical care did not rise to the level of "outrageous conduct," even where there was "no apparent justification" for delaying care).

Furthermore, Plaintiff's IIED claim fails for the additional reason that he fails to set forth any facts alleging that he suffered "severe emotional distress." *Bassam*, 2015 WL 4127745, at *11 (dismissing intentional infliction of emotional distress claim where plaintiffs merely asserted, in a "conclusory fashion," that they suffered "severe emotional distress" (cleaned up)).

For these reasons, Plaintiff is not likely to succeed on the merits of his IIED claim.

### C.    The public interest and balance of equities weigh against injunctive relief.

Finally, Plaintiff fails to satisfy the last two factors necessary to obtain injunctive relief: a showing that an injunction serves the public interest and that the balance of equities tips in his favor. *Winter*, 555 U.S. at 20.

First, Plaintiff has not established that an injunction is in the public interest. Courts have consistently recognized the strong public interest in "allowing unions to run their own elections and to resolve their own internal controversies."[5] *Brennan v. Silvergate Dist. Lodge No. 50, Int'l Ass'n of*

---

[5] Section 403 of the LMRDA provides that "[n]o labor organization shall be required by law to conduct elections of officers . . . in a different form or manner

*Machinists & Aerospace Workers, AFL-CIO*, 503 F.2d 800, 805 (9th Cir. 1974); *see also Wirtz v. Local 153, Glass Bottle Blowers Ass'n*, 389 U.S. 463, 475 (1968) (discussing the "vital public interest in assuring free and democratic union elections that transcends the narrower interest of the complaining union member"). Allowing one union member to interfere with SAG-AFTRA's upcoming election based on meritless legal theories, particularly because there are internal remedies available to Plaintiff to address his concerns,[6] does not serve the public interest — it hinders it.

Second, for similar reasons, the balance of equities tips decidedly in SAG-AFTRA's favor. SAG-AFTRA has already spent more than $130,000 printing and assembling the Voter's Guide. Bennett Decl. ¶ 6. Requiring it to print and then distribute to more than 50,000 members a new Voter's Guide in the midst of an ongoing election (where ballots are being counted in less than one month) would be a financial and administrative nightmare. *Cf. Macnab v. Gahderi*, No. CV0904498DDPRZX, 2009 WL 10671026, at *7 (C.D. Cal. July 28, 2009) (balance of equities weighed against preliminary injunction where an injunction would force company to refrain from using $50,000 worth of marketing materials). Enjoining the distribution of the Voter's Guide will impact members' ability to make knowledgeable voting choices, prompt other candidates to demand new photos, delay the election, and make the election outcome vulnerable to post-election challenges. Under these circumstances, the balance of equities weighs

---

than is required by its own constitution or bylaws, except as otherwise provided by this subchapter." 29 U.S.C. § 483.

[6] Article VI.B.2 of the Election Policy, Bennett Decl., Ex. C at 18–19, provides a post-election protest process where members may protest any aspect of the election process that they feel affected the outcome of the election. These protests are decided by the Local Election Committee and are appealable to the Department of Labor. 29 C.F.R. §§ 452.135–136.

strongly in favor of protecting union democracy over the complaints of one member, particularly where that member has readily available internal union remedies that, if Plaintiff remains dissatisfied, are appealable to the Department of Labor. *See Cooley v. California Statewide L. Enf't Ass'n*, No. 2:18-CV-02961-JAM-AC, 2019 WL 331170, at *4 (E.D. Cal. Jan. 25, 2019) (denying individual's motion for a preliminary injunction where the balance of equities tipped in favor of the union and an injunction would "impair the administration of the union").

## II.    THE TRO IS PROCEDURALLY DEFECTIVE.

Beyond failing to satisfy the substantive requirements necessary for the issuance of a TRO, Plaintiff's Motion is procedurally defective and the Court should therefore not consider his application for extraordinary relief. This Court's Standing Order provides, in relevant part, that ex parte applications that do not comply with Local Rules 7-19 and 7-19.1 "will not be considered." *See* Standing Order, Dkt. No. 9 at 13. Local Rule 7-19, for example, requires a party applying for an ex parte order to include in its filings "the name, address, telephone number and e-mail address of counsel for the opposing party." Plaintiff, however, did not include the "telephone number and e-mail address of counsel for the opposing party" in any of the documents filed. *See* Dkt. Nos. 1–2, 4–5. Moreover, Local Rule 7-19.1 rule requires a party to "make reasonable, good faith efforts to orally advise counsel for all other parties" of the proposed ex parte application and to "advise the Court in writing and under oath of efforts to contact other counsel and whether any other counsel, after such advice, opposes the application." Although, as discussed below, Plaintiff notified SAG-AFTRA of his application via email, he did not orally advise SAG-AFTRA of his application, and nothing on the docket reflects that he attempted to do so. These procedural flaws are fatal to his Motion. *See Rodney v. Toyota Motor Credit Corp.*, No. 5:24-CV-02202-AB, 2024 WL 5338656, at *2 (C.D. Cal. Nov. 20, 2024) (pro se plaintiff's application was procedurally improper where she failed to give notice to defendant); *Tecnogruas v.*

17

*Int'l Transportation Serv., LLC*, No. 2:24-CV-05984-AB-PVC, 2024 WL 5372408, at *2 (C.D. Cal. Nov. 8, 2024) (notice via email does not satisfy oral notice requirement).

Plaintiff's Motion is also procedurally deficient because he failed to properly serve SAG-AFTRA with his Motion. Local Rule 5-3.2.1 provides that in cases where a party has yet to appear, documents filed electronically must be served in accordance with Federal Rule of Civil Procedure 5 ("Rule 5"), and proof of service shall be made by declaration. Pursuant to Rule 5, service by email is not proper unless the other party has "consented to [such service] in writing." *See* Fed. R. Civ. P. 5(b) (service on an attorney is effectuated where documents are sent "by other electronic means that the person consented to in writing"). Here, although Plaintiff notified Jeffrey Bennett, SAG-AFTRA's General Counsel, regarding his application, he did so via email without Mr. Bennett's consent, which is not proper service under Rule 5. Even if Plaintiff had properly served SAG-AFTRA, he failed to file proof of service, rendering his application improper. *See Crosland v. Earle*, No. 2:24-CV-06277-AB-PVC, 2024 WL 4468002, at *1 (C.D. Cal. Aug. 14, 2024) (denying TRO where, *inter alia*, plaintiff failed to file proof of service).

Because Plaintiff's Motion is replete with procedural deficiencies, the Court should not consider it.

## III.    THE TRO IS MOOT.

On top of the Motion's substantive and procedural deficiencies, the Court should deny Plaintiff's TRO request for the additional reason that it is moot. The purpose of a TRO is to preserve the status quo before some action is taken; it is not to restore the status quo ante *after* the alleged harm occurs. *See Sinacore v. Robinson*, No. 2:25-CV-03251-MRA-PVC, 2025 WL 2087554, at *1 (C.D. Cal. June 20, 2025) (noting that TROs should be "restricted to serving their underlying purpose of preserving the status quo" (quoting *Granny Goose Foods, Inc. v. Bhd.*

18

*of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty*., 415 U.S. 423, 439 (1974)). In this case, by the time Plaintiff had filed his Motion late Wednesday afternoon, SAG-AFTRA had already mailed Voter's Guides to its more than 50,000 eligible voters in Los Angeles.

A court order cannot undo the mailing that has already occurred, and therefore Plaintiff's request for a TRO "enjoining Defendant from publishing, mailing, or distributing any member guide" is moot. Compl., Dkt. No. 1, at 6. *See Vegas Diamond Props., LLC v. F.D.I.C.*, 669 F.3d 933, 936 (9th Cir. 2012) (finding appeal moot where property sale that parties sought to enjoin went forward, and thus "the activities sought to be enjoined have already occurred and can no longer be prevented"). For this reason alone, Plaintiff's application for a TRO should be denied.

## IV.    AN EXPEDITED HEARING IS NOT WARRANTED.

Finally, because Plaintiff has not made the required showing for a TRO, which is identical to the standard required for a preliminary injunction, neither expedited discovery nor an expedited preliminary injunction hearing are warranted. *See, e.g.*, *Bradt v. T-Mobile US, Inc.*, No. 19-CV-07752-BLF, 2020 WL 1809716, at *3 (N.D. Cal. Feb. 28, 2020) (denying expedited hearing and discovery on preliminary injunction where plaintiff did not meet requirements for a TRO).

## CONCLUSION

For all the foregoing reasons, the Court should deny Plaintiff's ex parte motion for a temporary restraining order and for an expedited hearing on a preliminary injunction.

Dated:    August 15, 2025
          New York, New York

                                Respectfully submitted,

                                */s/ Olivia R. Singer*
                                Susan Davis (*pro hac vice* forthcoming)
                                Olivia R. Singer (Calif. Bar No. 312770)
                                Kayla Morin (*pro hac vice* forthcoming)
                                COHEN, WEISS and SIMON LLP
                                909 Third Avenue, 12th Floor
                                New York, New York 10022-4869
                                Tel: (212) 563-4100
                                sdavis@cwsny.com
                                *Attorneys for Defendant SAG-AFTRA*

# CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 11-6.2 of the United States District Court for the Central District of California, the undersigned, counsel of record for Defendant SAG-AFTRA, certifies that this brief contains 5,929 words, which complies with the word limit of L.R. 11-6.1.

Dated:      August 15, 2025
            New York, New York


                                        */s/ Olivia R. Singer*