Alexander Douglas Plank

c/o Arise Artists Agency

PO Box 930

Manhattan Beach, CA 90267

Phone: (703) 966-8504

Email: alex@alexplank.com

FILED

CLERK, U.S. DISTRICT COURT

08/18/2025

CENTRAL DISTRICT OF CALIFORNIA

BY _____GSA_____ DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDER DOUGLAS PLANK, | ) Case No.: 2:25-cv-07523-AB-SSCx |
| Plaintiff, | ) |
| vs. | ) MEMORANDUM IN REPLY TO |
| SAG-AFTRA | ) DEFENDANT'S OPPOSITION TO |
| Defendant | ) PLAINTIFF'S APPLICATION FOR |
| | ) TEMPORARY RESTRAINING ORDER |
| | ) |
| | ) |
| | ) |
| | ) |

## **<u>TABLE OF CONTENTS</u>**

TABLE OF CONTENTS ...................................................................................ii

TABLE OF AUTHORITIES ..........................................................................iii

INTRODUCTION..........................................................................................1

DEFENDANT'S MISAPPLICATION OF LABOR CONCERNS IS MISLEADING AND REFLECTS A PATTERN.........................................................1

PLAINTIFF IS DISABLED WITHIN THE MEANING OF THE ADA AND FEHA...4

PLAINTIFF SATISFIES THE STANDARD FOR EMERGENCY RELIEF………….4

LIKELIHOOD OF SUCCESS ON THE MERITS..............................................5

EX PARTE RELIEF IS JUSTIFIED.................................................................6

DEFENDANT'S ASSERTION OF UNIFORMITY IS MISLEADING AND DISCRIMINATORY AS APPLIED.................................................................6

EXHAUSTION IS INAPPLICABLE TO THIS CASE.......................................7

PLAINTIFF'S CDPA CLAIM IS PROPERLY GROUNDED.......................................9

PLAINTIFF IS LIKELY TO SUCCEED ON HIS CONSTITUTIONAL CLAIMS......11

THE PUBLIC INTEREST AND BALANCE OF EQUITIES WEIGH IN FAVOR OF INJUNCTIVE RELIEF.................................................................12

DEFENDANT'S RELIANCE ON A DICTIONARY DEFINITION MISCHARACTERIZES THE TERM "HEADSHOT" ..................................................12

DEFENDANT EXPLOITS PLAINTIFF'S DISABILITY TO MANUFACTURE A PROCEDURAL DEFECT.......................................................14

CONCLUSION.............................................................................................15

CERTIFICATE OF COMPLIANCE ..............................................................17

EXHIBIT A...................................................................................................18

**TABLE OF AUTHORITIES**

**Cases**

Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147 (1984)

Bass v. Cnty. of Butte, 458 F.3d 978 (9th Cir. 2006)

Borodaenko v. Twitter, Inc., No. 22-cv-07226-AMO, 2024 WL 3908104 (N.D. Cal. Aug. 21, 2024)

Fort Bend Cnty. v. Davis, 139 S. Ct. 1843 (2019)

Garity v. APWU Nat'l Lab. Org., 840 F. App'x 924 (9th Cir. 2020)

Josephs v. Pac. Bell, 443 F.3d 1050 (9th Cir. 2006)

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)

Miller v. Sacramento City Unified Sch. Dist., No. 2:21-cv-00757, 2022 WL 392529 (E.D. Cal. Feb. 9, 2022)

Nat'l Fed'n of the Blind v. Lamone, 813 F.3d 494 (4th Cir. 2016)

Perez v. Sturgis Pub. Schs., 598 U.S. 142 (2023)

Tecnogruas v. Int'l Transp. Serv., LLC, No. 2:24-cv-05984-AB-PVC (C.D. Cal. July 24, 2024)

Tennessee v. Lane, 541 U.S. 509 (2004)

Valenzuela v. Kraft, Inc., 801 F.2d 1170 (9th Cir. 1986)

Zipes v. Trans World Airlines, Inc., 455 U.S. 385 (1982)

**Statutes**

42 U.S.C. § 12102

42 U.S.C. § 12117(a)

42 U.S.C. §§ 2000e-2, 2000e-5

Cal. Civ. Code §§ 54–55.3

Cal. Gov't Code § 12926

**Regulations**

28 C.F.R. § 36.104

29 C.F.R. §§ 452.67–69

INTRODUCTION

This case arises from a simple but important principle: disabled individuals are entitled to full and equal participation in civic and organizational life without being belittled or marginalized. Yet, Defendant has gone so far as to characterize Plaintiff's ADA claim as mere "cries of discrimination" and a "request for disparate treatment." Such dismissive rhetoric is not only inaccurate but inappropriate in the context of federal disability law. And it highlights the heart of this issue: a clearcut civil rights violation.

The Americans with Disabilities Act was enacted precisely to prevent this kind of diminishment — to ensure that disabled individuals are not treated as nuisances when they assert their right to equal access. Defendant's rhetoric underscores the very problem at the center of this case: a refusal to recognize Plaintiff's disability identity as worthy of the same respect afforded to others. The question before the Court is not whether Plaintiff seeks "special treatment," but whether Defendant is obligated to comply with the law's guarantee of equal participation, dignity, and nondiscrimination.

DEFENDANT'S MISAPPLICATION OF LABOR CONCERNS IS MISLEADING AND REFLECTS A PATTERN

Defendant's mention of 29 C.F.R. §§ 452.67–69 is not merely misplaced — it is misleading. The cited regulation governs a very narrow subject: the distribution of campaign literature. It addresses mailing logistics, allocation of costs, and equal access to distribution. It has nothing to do with voter guide content, photographic requirements, or the alteration of candidate images. It is entirely irrelevant to the issue before the Court.

With that said, by invoking this regulation, Defendant attempts to mischaracterize Plaintiff's claim as though it were simply a DOL election-technicality, when in fact the claim arises under the Americans with Disabilities Act. The ADA prohibits discrimination in the treatment of disabled individuals — including in the administration of programs for a labor organization. Cropping out Plaintiff's service animal from his headshot is not a question of campaign expense allocation or election procedures; it is a question of disability rights and equal treatment under federal law.

---

Consequently, it should not even be mentioned in an attempt to justify cropping out a service animal, or any other protection granted by the ADA. The regulation makes no mention of headshot specifications or alterations of images. Its invocation is clearly an attempt by Defendant to turn this case into something that it's not. And ironically, the regulation actually supports Plaintiff's position. It states that "labor organizations have an affirmative duty to comply with all reasonable requests of any candidate to distribute campaign literature even if doing so is inconvenient or requires additional staffing" indicating a requirement of flexibility and an obligation of the Defendant to accommodate any candidate. And the facts of this case illustrate that SAG-AFTRA has failed to satisfy that duty by not employing or designating staff to ensure that its election practices are implemented in compliance with the ADA's requirements for nondiscrimination and reasonable accommodation. With that said, the text of the labor code and the Labor Management Relations Act is not relevant to Plaintiff's claim and only brought up by Defendant to divert attention from what matters.

This maneuver is not isolated. It fits a broader pattern in Defendant's briefing. Defendant has attempted to sideline the case with procedural objections about service, despite having actual notice and engaging in opposition. And Defendant also seeks to divert the Court with other irrelevant labor case law and election regulations that do not speak to the issue at hand. These tactics are designed to obscure the merits, bury the constitutional (and ADA) issues under layers of ancillary law, and pressure a disabled pro se litigant with limited resources into giving up.

Defendant's reliance on *Tecnogruas v. Int'l Transportation Serv., LLC*, No. 2:24-cv-05984-AB-PVC, 2024 WL 5372408 (C.D. Cal. Nov. 8, 2024), is also misplaced. In *Tecnogruas*, the plaintiff sought to block the loss of shipping cranes, claiming they were unique and that losing them would cause reputational harm. The court denied relief because the plaintiff provided no evidence that the cranes were truly irreplaceable, no support that goodwill harm was anything more than speculative, and the request for an injunction was deemed "thin and barebones." By contrast, Plaintiff here has demonstrated

a concrete and time-sensitive injury: the alteration of his likeness in SAG-AFTRA's election guide erased the presence of his service animal, a core element of his identity as a disabled actor. Unlike cranes, which most reasonable people would consider fungible, a disabled person's dignity cannot be replaced or remedied after the fact. Once the election is over, that opportunity — and dignity — is permanently lost, which is the very definition of irreparable harm.

Defendant mentions, without citation — a violation of L.R. 11-3.9 — *McDonnell Douglas* (*See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)) and cites cases like *Borodaenko v. Twitter* No. 22-CV-07226-AMO, 2024 WL 3908104, at *4 (N.D. Cal. Aug. 21, 2024) and *Garity v. APWU.,* 840 F. App'x 924, 927 (9th Cir.2020) to argue that Plaintiff cannot establish a prima facie case of discrimination. But these authorities are employment cases — where the issue is whether an employee was fired, demoted, or otherwise subjected to an "adverse employment action." Plaintiff's claim is not about his employment relationship. It arises from the denial of equal access to a non-employment related union service (an election) and the discriminatory cropping of a disability-related feature from his candidate headshot.

The ADA and FEHA reach far beyond hiring and firing. They protect against discrimination in "services, programs, and activities" of covered entities, which includes unions administering elections. Defendant's invocation of the *McDonnell Douglas* framework is misleading because Plaintiff does not need to prove an "adverse employment action" like termination or demotion. Instead, Plaintiff must show exclusion from, or unequal treatment in, a program or benefit because of disability. That standard is met here: the cropping of Plaintiff's service animal — a recognized disability accommodation — from his candidate photo denied him equal participation in the Voter's Guide on the same terms as nondisabled candidates.

Even if one applied the *McDonnell Douglas* burden-shifting test, Plaintiff could satisfy it. He is disabled; he was otherwise qualified to run for office; and he was subjected to an adverse action — the alteration of his official election photo in a manner

---

that erased his disability identity. That action was taken intentionally and pursuant to a policy that Defendant knows disproportionately impacts disabled members who use service animals, wheelchairs, canes, or other visible aids. That is more than sufficient to establish a prima facie case of discrimination (and even then, the Court would still maintain jurisdiction).

At bottom, Defendant's reliance on employment-law doctrines is a red herring. This case is not about discipline or termination. It is about access, equality, and dignity in a democratic process guaranteed to every union member. The correct analytical frame is the ADA's prohibition on discriminatory exclusion from programs and activities — not the narrower test for employment discrimination.

<u>PLAINTIFF IS DISABLED WITHIN THE MEANING OF THE ADA AND FEHA</u>

Plaintiff is a person with disabilities as defined under the ADA, 42 U.S.C. § 12102, and FEHA, Cal. Gov't Code § 12926. His disability substantially limits major life activities, including communication. Plaintiff relies on a service animal that accompanies him in public in order to participate fully in daily life.

Additionally, plaintiff applied for and was determined to meet the standard required to receive the California Assistance Dog Tag under the rules laid out by the California Code, Food and Agricultural Code (CIV § 54.2, FAC § 30850).

The ADA specifically recognizes the use of service animals as a protected accommodation. See 28 C.F.R. § 36.104 (defining service animals as dogs individually trained to perform tasks for individuals with disabilities). Plaintiff's service animal is not optional or recreational, but an integral component of his ability to function independently and safely in public.

Accordingly, there can be no serious dispute that Plaintiff is disabled within the meaning of the statutes. The cropping of his service animal from his candidate photograph therefore implicates his disability identity directly, in the same way that cropping out a wheelchair would. Defendant's effort to erase those disability-related features is discriminatory treatment under both the ADA and FEHA.

## PLAINTIFF SATISFIES THE STANDARD FOR EMERGENCY RELIEF

Defendant paints the TRO standard as insurmountable, citing *Winter*, 555 U.S. 7 (2008) and its progeny (see Tecnogruas, supra, at *2-3*), but this mischaracterizes both the law and the facts of this case. While it is a fact that injunctive relief is extraordinary, courts grant TROs and preliminary injunctions whenever the moving party demonstrates ongoing, irreparable harm and a likelihood of success on the merits. Plaintiff has met that showing here.

## LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiff's claim is grounded in the Americans with Disabilities Act and the U.S. Constitution. Defendant's cropping policy, as applied, has a discriminatory effect by removing Plaintiff's service animal from his headshot while allowing other non-face elements (such as hats and slogans, and even *a weird graphical composition of a face on top of money [EXHIBIT A])* to remain. Courts have long recognized that neutral rules, when applied in ways that disproportionately burden disabled individuals, can constitute unlawful discrimination. Defendant's attempt to disguise this ADA violation as "uniformity" does not eliminate the disparate impact.

Every day the altered voter guide is distributed (and is still accessible on SAG-AFTRA's website) without a correction, Plaintiff suffers irreparable harm as this guide is the single union-funded piece of campaign literature guaranteed to reach every voter. Cropping out Plaintiff's service animal — an integral part of his daily life and identity as a disabled actor — diminishes his authenticity and presents him as someone he is not. That distortion cannot be undone after the election. No amount of damages or retroactive relief can restore the lost credibility and opportunity in the future.

Plaintiff seeks only equal treatment: to be presented as he actually is, without artificial alteration that disadvantages him on account of disability. Defendant, by contrast, would suffer no cognizable injury if Plaintiff's unaltered headshot were published. The minimal effort to include Plaintiff's photograph as submitted pales in comparison to the ongoing reputational and electoral harm faced by Plaintiff.

The public interest strongly favors granting relief. Union elections are not private matters; they affect thousands of members and implicate statutory guarantees of fairness. And, at the time of this filing, the voter guide with Plaintiff's cropped headshot, is publicly accessible by the public on SAG-AFTRA's website. More importantly, the ADA reflects a national policy of eradicating discrimination against disabled people. Protecting disabled members from exclusionary or burdensome election practices aligns directl with the public interest in ensuring both democratic legitimacy and civil rights compliance.

<u>EX PARTE RELIEF IS JUSTIFIED</u>

Defendant emphasizes that ex parte TROs are disfavored. That is true, but this case presents precisely the type of "very few circumstances" that justify such relief: an election underway, irreparable harm occurring daily, and no way to rewind the process once ballots are cast under the distorted voter guide. Plaintiff notified Defendant immediately upon filing, and Defendant responded substantively the same day, ensuring no party was deprived of the opportunity to be heard. The urgency is real, not manufactured.

<u>DEFENDANT'S ASSERTION OF UNIFORMITY IS MISLEADING AND DISCRIMINATORY AS APPLIED</u>

Defendant argues that Plaintiff cannot establish disparate treatment because SAG-AFTRA applies its cropping rule uniformly, citing prior instances where it cropped another candidate's dog from her photo. But this comparison is clearly inapposite, as the other candidate simply chose to include her pet in a campaign photo. Plaintiff, by contrast, has a service animal that accompanies him as part of daily life. The service animal is not a discretionary campaign prop; it is an extension of Plaintiff's disability identity, protected by the ADA. Treating the two situations as "equal" is itself unequal treatment, because the burden imposed falls uniquely on disabled candidates.

Moreover, Defendant's presentation of uniformity is selective and misleading. The Voter's Guide includes numerous candidate headshots with elements beyond "head and face," such as hats, shirts with visible slogans, jewelry, and distinctive backdrops. There

is even a graphic with a photo of a candidate's head inside a penny, which certainly does not meet Merriam Webster's definition of a headshot, much less anyone else's [EXHIBIT A]. Defendant has offered no explanation as to why those features were permissible while Plaintiff's service animal — integral to his disability accommodation — was singled out for exclusion. This disparate enforcement underscores that the cropping policy is not, in fact, neutral.

The invocation of Title IV and a supposed "legitimate, non-discriminatory reason" does not insulate Defendant from ADA liability. Title IV governs campaign literature distribution; it does not authorize unions to erase disability-related features from candidate headshots. The ADA is the controlling statute here, and it prohibits rules or practices that disproportionately burden disabled individuals, even when framed as "neutral." By cropping out Plaintiff's service animal, while allowing non-disability-related deviations to remain, Defendant treated Plaintiff less favorably because of his disability.

<u>EXHAUSTION IS INAPPLICABLE TO THIS CASE</u>

Defendant's argument that Plaintiff was required to exhaust administrative remedies under the ADA and FEHA mischaracterizes the nature of his claims. Plaintiff is not suing as an *employee* for workplace discrimination. Rather, Plaintiff sues in his capacity as a union member and candidate for elected office, challenging discriminatory treatment in the administration of a union election.

The exhaustion requirements cited by Defendant — EEOC charge-filing under the ADA, and DFEH (now Civil Rights Department) complaint-filing under FEHA — apply to employment-based claims, such as wrongful termination, failure to accommodate at work, or disparate treatment in hiring. Courts recognize that the ADA extends beyond employment to public accommodations and participation in programs, and in those contexts, exhaustion is not required. The public nature of this image dissemination affects Plaintiff outside of the scope of his Title 1 relationship with SAG-AFTRA.

Here, Plaintiff's claims arise from Title III of the ADA as applied to membership

---

organizations, and from FEHA's protections against disability-based exclusion in public and quasi-public programs. The gravamen of Plaintiff's claim is not that SAG-AFTRA denied him employment, but that it applied its election rules in a way that discriminates against his disability. That is not the kind of claim governed by the administrative exhaustion requirements Defendant cites.

Defendants' reliance on *Miller v. Sacramento City Unified Sch. Dist.* No. 2:21-cv-00757, 2022 WL 392529 (E.D. Cal. Feb. 9, 2022) is misplaced. First, *Miller* incorrectly treated ADA exhaustion as jurisdictional, a view the Supreme Court has since rejected. See *Fort Bend County v. Davis*, 587 U.S. (2019). Those cases involved employment settings where plaintiffs bypassed the EEOC or DFEH. Plaintiff's case does not involve employment discrimination, and therefore exhaustion is not a jurisdictional prerequisite, so this Court retains full authority to adjudicate Plaintiff's claims.

Even assuming arguendo that Title I applies, the statute does not impose a standalone exhaustion bar—it merely incorporates Title VII's enforcement framework. 42 U.S.C. § 12117(a). That framework governs only "unlawful employment practices" and channels job-related remedies such as reinstatement or back pay through the EEOC. See 42 U.S.C. §§ 2000e-2, 2000e-5(e); *Josephs v. Pac. Bell*, 443 F.3d 1050, 1061 (9th Cir. 2006). Plaintiff's claim, by contrast, does not concern employment but unequal access to programs offered by the union unrelated to employment—relief the EEOC has no authority to provide. And even where exhaustion provisions do apply, the Supreme Court has made clear they cannot bar claims for remedies outside an agency's statutory power. *Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 148–49 (2023).

Further, the EEOC filing requirement is not jurisdictional. See *Fort Bend County v. Davis*, 139 S. Ct. 1843, 1850 (2019). Defendants' reliance on exhaustion as a jurisdictional bar is misplaced, and this Court retains full authority to adjudicate Plaintiff's claims.

Finally, even if exhaustion were somehow required, Plaintiff's claims are preserved under the doctrine of equitable tolling. The Supreme Court has held that the

EEOC filing requirement is "not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982); see also *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984); *Valenzuela v. Kraft, Inc.*, 801 F.2d 1170, 1173 (9th Cir. 1986).

Plaintiff is a disabled pro se litigant who faced unique barriers in navigating complex administrative procedures. Courts have consistently recognized that equitable tolling applies where strict compliance with the EEOC filing requirement would unfairly deprive a claimant of the opportunity to vindicate civil rights. Here, tolling is particularly appropriate because the relief sought — declaratory and injunctive relief concerning union election rules — lies beyond the EEOC's remedial authority. To dismiss Plaintiff's claims for failure to exhaust would fail to honor the ADA's core purpose of ensuring full and equal participation for individuals with disabilities.

Additionally, the ADA and FEHA are both remedial statutes that should be construed liberally to avoid foreclosing claims on procedural technicalities. The more important inquiry is whether Defendant's conduct has the substantive effect of excluding disabled members from equal participation in union elections. That question is properly before this Court.

## PLAINTIFF'S CDPA CLAIM IS PROPERLY GROUNDED

Defendant's contention that the California Disabled Persons Act ("CDPA") does not apply to the union's election process rests on a narrow reading of the statute. The CDPA, Cal. Civ. Code §§ 54–55.3, is designed to secure for disabled individuals "full and equal access, as other members of the general public, to accommodations, advantages, facilities, … and privileges of all common carriers, … public facilities, and other places to which the general public is invited" (§ 54.1(a)(1)) (emphasis added). Courts have repeatedly emphasized that the statute is remedial in nature and must be liberally construed to effectuate its purpose.

Defendant's position ignores the fact that California law explicitly guarantees the right of disabled individuals to be accompanied by their service animals in public spaces. Section 54.2(a) of the Civil Code provides that "[e]very individual with a disability has the right to be accompanied by a guide dog, signal dog, or service dog, especially trained for the purpose, in any of the places specified in Section 54.1 without being required to pay an extra charge or security deposit for the guide dog, signal dog, or service dog." Plaintiff's headshot was taken at a public industry event where a professional photographer was taking headshots of actors. By law, Plaintiff had the right to be accompanied by his service dog in that space. The service animal's presence in the photograph was therefore not a matter of preference but a direct result of Plaintiff exercising a legally protected right. Cropping the dog out of the image effectively penalizes Plaintiff for exercising this right and converts a statutory guarantee into a basis for unequal treatment.

SAG-AFTRA's Voter's Guide is precisely the kind of "advantage, privilege, and accommodation" covered by the CDPA. The Guide is not a private, internal memo; it is the official, union-funded vehicle for communicating candidate information to the entire membership body— a membership body that functions as the "public" within the union's governance structure. And it is publicly accessible by the public at large on its website. To exclude or diminish a disabled member's candidacy in this publication is to deny him equal access to one of the core privileges of not only union membership but also societal participation in general.

Defendant's reliance on *Bass v. County of Butte*, 458 F.3d 978 (9th Cir. 2006), is misplaced. *Bass* addressed whether the CDPA and Unruh Act could be used to pursue *employment discrimination claims based on failure to accommodate work-related injuries*, and the Ninth Circuit held they could not. That narrow holding concerned employment, where FEHA supplies the exclusive remedy—not union membership or participation rights. Nothing in *Bass* suggests the CDPA is unavailable to challenge how a membership organization or union structures programs or access for its members.

California courts, have consistently construed the CDPA broadly to ensure access beyond "brick-and-mortar" settings, including access to nontraditional spaces like jails, entertainment venues, and online platforms.

Section 54.2 reinforces this point. Its guarantee that individuals with disabilities have the right to be accompanied by their service animals wherever they go underscores that integration, not exclusion, is the governing principle. The idea that a disabled actor's service animal — regularly included in headshots for casting, could be cropped out of an election photo without violating equal access principles runs directly contrary to the CDPA's purpose.

PLAINTIFF IS LIKELY TO SUCCEED ON HIS CONSTITUTIONAL CLAIMS

Defendant's assertion that Plaintiff is not likely to succeed on his constitutional claims mischaracterizes both the nature of this case and the governing law. Courts have long recognized that internal union elections implicate fundamental associational and democratic rights, and that those rights are enforceable when a union's conduct undermines equal participation in the electoral process. And under the ADA, covered entities are prohibited from engaging in practices that diminish or exclude individuals with disabilities from those processes. See, e.g., *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494 (4th Cir. 2016) (holding that inaccessible absentee ballot tools violated the ADA because they denied blind voters meaningful access to the electoral process).

Here, Plaintiff's claim is not abstract. The cropping of his service animal from his candidate photograph does more than alter an image — it alters the way voters perceive him, depriving him of the ability to present himself authentically and equally in the democratic process of his union. That is a constitutional harm tied directly to equal protection principles and the First Amendment values of speech and association. To suggest otherwise is to ignore the reality that union elections are governed not just by internal policy, but by statutory and constitutional safeguards.

Defendant relies heavily on its internal election rules, but those cannot override constitutional requirements. A rule that purports to treat everyone "the same" but in

practice uniquely burdens disabled candidates is not neutral; it is discriminatory. Courts have consistently held that rules with discriminatory impact, even if facially neutral, violate equal protection and statutory anti-discrimination protections. Plaintiff has therefore shown more than a likelihood of success — he has shown that Defendant's position rests on a misreading of both Title IV and constitutional principles.

THE PUBLIC INTEREST AND BALANCE OF EQUITIES WEIGH IN FAVOR OF INJUNCTIVE RELIEF

Defendant mischaracterizes the public interest. While courts recognize a general interest in allowing unions to conduct their own elections, that interest does not extend to shielding discriminatory practices from scrutiny. Congress enacted Title IV of the LMRDA, and the ADA stands alongside it, precisely because experience showed that unchecked union control over elections could result in abuse, exclusion, and discrimination. Thus, the public interest is not in blind deference to union policies, but in ensuring that such policies comply with federal law and protect the equal rights of all members, including disabled members.

Here, the equities cut sharply in Plaintiff's favor. Plaintiff seeks only to be presented to voters in the same authentic manner as nondisabled candidates — without having his likeness artificially altered to exclude his service animal. Defendant, by contrast, cannot articulate any tangible harm that would result from simply printing Plaintiff's headshot as submitted. The balance is therefore one-sided: without relief, Plaintiff suffers dignitary, reputational, and associational harms that cannot be undone once the election occurs. With relief, Defendant incurs no meaningful burden beyond honoring the very anti-discrimination protections the law requires.

DEFENDANT'S RELIANCE ON A DICTIONARY DEFINITION MISCHARACTERIZES THE TERM "HEADSHOT"

Defendant cites the Merriam-Webster definition of "headshot" as "a photograph of a person's head and face" to justify its restrictive cropping policy. But that definition is

divorced from how the term is actually understood in the entertainment industry and in other professional contexts.

In the entertainment industry, a "headshot" is a term of art: it generally refers to a professional photograph of the head and shoulders, often extending to the upper torso. Headshots regularly include hairstyles, clothing, glasses, or even mobility aids. For disabled performers, service animals are often visible, because they are inseparable from the actor's daily life and professional presentation. Casting directors expect this, and Plaintiff is represented by an agency with multiple actors whose official headshots include their service animals in the photographs used as industry standard headshots.

The point is not limited to the entertainment field. In the judiciary, official portraits of federal judges are commonly described as their "headshots," yet those photographs often include contextual elements beyond the face. No one would seriously argue that a judge's headshot is "not a headshot" simply because it contains an American flag or a bookcase in the background. To suggest otherwise would ignore the well-understood professional meaning of the term.

Casting directors and producers expect headshots to convey the actor's *true look*, not an artificially cropped or sanitized version. By invoking a general dictionary rather than the industry's professional definition, Defendant seeks to rewrite the term in a way that suits its litigation position but conflicts with everyday practice. Additionally, Defendant misrepresents what "headshot" means in the very industries its members work in. This choice underscores that the cropping policy is not about ensuring neutrality or uniformity but about enforcing an arbitrary restriction that, in practice, singles out Plaintiff's disability-related reality.

Defendant claims that its uniform cropping rule ensures equality, but as applied to Plaintiff, the policy has a discriminatory effect. Plaintiff does not own a pet; he relies on a service animal that accompanies him everywhere as part of daily life. The only reason the service dog appeared in Plaintiff's headshot photograph is because he was photographed at an event where a professional photographer was taking headshots of actors.

By contrast, the example cited by Defendant (Joanna Leeds) involved a candidate who affirmatively chose to take a photo with her dog (her dog does not go with her everywhere during her daily life because it is not a service dog) and use that as part of her campaign image. Defendant's position effectively imposes an undue burden on disabled candidates: they must ensure that their service animal is excluded from every available headshot or risk having their photograph altered in a way that diminishes their candidacy. Non-disabled candidates do not face this burden; they may submit any headshot without fear that an integral part of their daily life will be deemed improper. There is no conceivable harm to the union or to other candidates if Plaintiff's headshot includes his service animal. The image does not give Plaintiff an unfair advantage, mislead voters, or undermine the uniformity of the voter guide. It simply reflects the reality of Plaintiff's daily life as a disabled member. To crop out his service animal, while allowing other candidates' hats, slogans on shirts, and other non-face elements, is not equal treatment— it is disparate treatment rooted in disability discrimination.

The discriminatory effect of this policy extends beyond service animals. A candidate photographed in a wheelchair, using an artificial limb, or with a visible cochlear implant would likewise risk having those identity-defining features cropped out, leaving an artificial image that fails to reflect reality. Disabled actors often include service animals in their professional headshots, and in some cases the animals are even considered part of the casting process—as with actress Lillian Carrier, whose service dog appeared alongside her on screen in *Everything's Gonna Be Okay*. Title IV requires not only equal access but also that rules be applied "under the same conditions" to all candidates. Defendant's rigid application of its cropping policy does the opposite: it selectively penalizes Plaintiff for his disability, while leaving non-disabled candidates unaffected.

## DEFENDANT EXPLOITS PLAINTIFF'S DISABILITY TO MANUFACTURE A PROCEDURAL DEFECT

Defendant seeks to turn a procedural formality into a weapon against a disabled

litigant. Plaintiff is autistic, and an insistence on oral-only notice operates as a barrier to participation. Local Rule 7-19.1 requires only "reasonable notice," and Plaintiff complied in good faith by emailing Defendant's General Counsel, who acknowledged receipt, stated opposition, and copied chambers within minutes. Defendant thus had actual notice and filed a substantive opposition immediately.

Defendant's position is not about fairness; it is about gamesmanship. They attempt to manufacture a defect where none exists, exploiting Plaintiff's disability and pro se status. The ADA forbids court processes being applied to exclude disabled individuals. See *Tennessee v. Lane*, 541 U.S. 509, 522 (2004). The Rule's purpose—ensuring notice and an opportunity to respond—was fully satisfied here. This Court should not permit Defendant to exploit disability to evade judicial scrutiny. Doing so would endorse the very inequity the ADA was designed to prevent: procedures as barriers to participation.

CONCLUSION

Defendant's opposition reveals not a genuine concern for fairness, but a deliberate effort to distract this Court with irrelevant citations, procedural nitpicking, and misleading arguments with the goal of steamrolling a disabled member. Plaintiff did not seek special treatment — only equal treatment under the law. By cropping out Plaintiff's service animal and denying him the opportunity to present himself as he actually exists, SAG-AFTRA reduced a disabled actor's identity to something it found more convenient. That is not "neutral enforcement of policy." It is discrimination dressed in the language of bureaucracy. For these reasons, and because the balance of equities and the public interest squarely favor enforcing disability rights over preserving discriminatory election rules, Plaintiff respectfully requests that this Court grant declaratory relief, require Defendant to adopt ADA-compliant policies, and award compensatory, statutory, and and punitive damages sufficient to deter this type of egregious conduct in the future.

Dated: August 17, 2025

Los Angeles, CA


Respectfully submitted,

/s/Alexander Douglas Plank


Alexander Douglas Plank

c/o Arise Artists Agency

PO Box 930

Manhattan Beach, CA 90267

Phone: (703) 966-8504

Email: alex@alexplank.com

CERTIFICATE OF COMPLIANCE

The undersigned, Plaintiff, certifies that this brief contains 4,903 words, which complies with the word limit of L.R. 11-6.1.

Dated: August 17, 2025

Respectfully submitted,

/s/Alexander Plank

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

2025 Philadelphia Local Voter Guide.pdf

The National Board member, by virtue of their election to that position, shall also serve as a Convention Delegate. The National Board Member will also serve as a Local Board Member and Local Executive Committee Member during the first two years of the term. The Vice President – Actor/Performer will also serve as a member of the Local Executive Committee. The Local Officer and Local Board Members, by virtue of their election to those positions, are eligible to serve as Alternate National Board Members.

# NATIONAL BOARD MEMBER / 4 YEAR TERM
## VOTE FOR NO MORE THAN ONE (1)



### 01 / HAROLD G. EDER II
Look at These other Bio's; for all the years of experience and time as "leadership", what have they Done on your Behalf? Is there documented proof to back it up? Together Let's utilize Ingenuity and Boldness with programs that will be the model for other Locals & National. Your Member$hip Due$ Currently are Nothing more than a glorified Time$hare. Eating in a restaurant would you accept a menu item That wa$n't what you ordered? If it came out under cooked,$end it back? Elect me to be your repre$entative and you will have a yearly Budget to vote up or

### 02 / NIKKI IZANEC
I serve as: Proud two-term Philadelphia local President Voting member of both the national commercials and network codes negotiating committees. Co-Chair of the commercial performer's committee, vice chair of the child protection task force nationally as well as various other committees and initiatives. A member in this pivotal time navigating AI, scarcity of work, and job retention (the same as most of you). It would be my privilege to serve as your Philadelphia National Board Member. I won't be spending money on election mailers and rather spend the funds patronizing the arts and the artists who work.