FILED

CLERK, U.S. DISTRICT COURT

8/26/25

CENTRAL DISTRICT OF CALIFORNIA

BY ____CS____ DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

Alexander Douglas Plank

c/o Arise Artists Agency

PO Box 930

Manhattan Beach, CA 90267

Phone: (703) 966-8504

Email: alex@alexplank.com

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ALEXANDER DOUGLAS PLANK, | ) | Case No.: 2:25-cv-07523-AB-SSCx |
|      Plaintiff, | ) | |
|    vs. | ) | **NOTICE OF MOTION AND MOTION** |
| SAG-AFTRA | ) | **FOR PRELIMINARY INJUNCTION** |
|      Defendant | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on Friday, September 26, 2025, at 10:00 a.m., 2025, or as soon thereafter as the matter may be heard, Plaintiff Alexander Douglas Plank will, and hereby does, move this Court pursuant to Federal Rule of Civil Procedure 65(a) for entry of a preliminary injunction.

Plaintiff seeks an order:

1. 1. Granting a preliminary injunction enjoining Defendant SAG-AFTRA from enforcing or applying its "no animals in photos" policy in a manner that excludes or erases service animals from members' official photographs, and requiring Defendant to accept and maintain Plaintiff's authentic image for use in union records and publications; and

2. Granting such other and further relief as the Court deems just and proper.

3. Preserving all other necessary interim protections to prevent irreparable harm pending full resolution of the preliminary-injunction proceedings.

 This motion is made on the grounds that Plaintiff is likely to succeed on the merits of his claims under the Americans with Disabilities Act and related state civil-rights statutes; that he faces irreparable injury absent immediate relief; that the balance of equities tips sharply in his favor; and that the public interest strongly favors an injunction, both to address the present circumstances and to ensure that these issues are adjudicated fully and do not evade review. This motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, the pleadings and papers on file in this action, and such other evidence and argument as may be presented at or before the hearing.

Plaintiff is aware that the Court's regular civil motion calendar is on Fridays and has noticed this motion accordingly. Plaintiff respectfully submits, however, that if the Court determines that an earlier hearing is warranted in light of the issues presented, he will be prepared to proceed on an expedited basis at the Court's convenience.

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ......................................................................... ii

TABLE OF AUTHORITIES ................................................................................... iv

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 3

LEGAL STANDARD ............................................................................................... 4

I. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS ................................. 5

  A. Facially Neutral Policies That Disproportionately Burden People With Disabilities Violate the ADA ...................................................................................... 5

  B. The ADA Requires Reasonable Modifications; ...................................................... 7

  C. "Meaningful Access" and Program Participation Include Official Representation in the Election Medium ........................................................................ 8

  D. The Law Protects Against Visual Exclusion That Sends a Stigmatizing Message .. 9

  E. Plaintiff Also Satisfies the Merits Under State Law (CDPA and FEHA) .............. 10

  F. Defendant's Cropping Policy Misrepresents Plaintiff's Identity and Denies Equal Recognition ................................................................................................. 11

  G. Defendant's "Uniform Rule" Defense Fails as a Matter of Law ........................... 12

II. IRREPARABLE HARM ....................................................................................... 8

  A. Ongoing Injury from Dissemination ................................................................... 10

  B. "Neutral" policies that deny "meaningful access" impose cognizable harms ........ 10

  C. ADA cases recognize policy-based exclusions as targets for injunctive relief ...... 10

  D. Performer-identity injuries are uniquely irreparable. ......................................... 11

III. THE BALANCE OF EQUITIES TIPS SHARPLY IN PLAINTIFF'S FAVOR ........ 11

IV. THE PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF ......................... 12-13

CONCLUSION ......................................................................................................... 13

CERTIFICATE OF COMPLIANCE ......................................................................... 16

EXHIBIT A .............................................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**

Alexander v. Choate, 469 U.S. 287 (1985) ............................................................ 5, 9, 10

Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127 (9th Cir. 2011) ...................... 4

Ariz. Dream Act Coal. v. Brewer, 757 F.3d 1053 (9th Cir. 2014) ................................ 13

Baughman v. Walt Disney World Co., 685 F.3d 1131 (9th Cir. 2012) ...... 5, 8, 10, 11, 12

Chapman v. Pier 1 Imports (U.S.) Inc., 631 F.3d 939 (9th Cir. 2011) (en banc) ....... 6, 11

Chalk v. U.S. Dist. Ct., 840 F.2d 701 (9th Cir. 1988) ............................................ 8, 11

Crowder v. Kitagawa, 81 F.3d 1480 (9th Cir. 1996) ...................................... 2- 5, 8, 9, 13

Elrod v. Burns, 427 U.S. 347 (1976) ) ................................................................... 1, 8

Enyart v. Nat'l Conf. of Bar Examiners, 630 F.3d 1153 (9th Cir. 2011) ...................... 10

Fortyune v. AMC Theatres, 364 F.3d 1075 (9th Cir. 2004) ........................... 5, 8, 10, 12

Gilliam v. Am. Broad. Cos., 538 F.2d 14 (2d Cir. 1976) .........................7, 8, 9, 12

Midler v. Ford Motor Co., 849 F.2d 460 (9th Cir. 1988) .........................................10, 11

Mississippi Univ. for Women v. Hogan, 458 U.S. 718 (1982) ................................... 6, 9

Nat'l Fed'n of the Blind v. Lamone, 813 F.3d 494 (4th Cir. 2016) ............................. 10

Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) ................................................... 6

Smith v. Montoro, 648 F.2d 602 (9th Cir. 1981) ..................................................... 7, 9, 11

United States v. Virginia, 518 U.S. 515 (1996) ...................................................... 6, 9

Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7 (2008) ............................................... 4

**Statutes**

Americans with Disabilities Act (ADA) ................................................. 4- 6, 8, 9, 11-14

California Disabled Persons Act (CDPA),

  Cal. Civ. Code §§ 54–55.3; § 54.2 .................................................................. 6

California Fair Employment and Housing Act (FEHA),

  Cal. Gov't Code § 12940(b) ........................................................................... 10

Cal. Civ. Code § 52 ....................................................................................... 6

42 U.S.C. § 1988 ........................................................................................... 6

**Constitutional Provisions**

U.S. Const. amend. I ................................................................................................. 1

U.S. Const. amend. XIV ........................................................................................ 14

**Rules**

Fed. R. Civ. P. 65(a) ................................................................................................. ii

# INTRODUCTION

Courts have long held that the loss of rights constitutes irreparable harm. See *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (loss of First Amendment rights "for even minimal periods of time" is irreparable). Courts likewise recognize that injuries rooted in stigma, exclusion, and denial of equal recognition are concrete dignitary harms, not abstract grievances. The stigma and denial of equal recognition cannot be undone by later compensation.

In *Sturgis v. Copiah County School District*, litigation brought by the ACLU challenged a school's refusal to include a student's senior portrait in the yearbook because she declined to wear attire mandated by a facially neutral dress code—dresses for girls, tuxedos for boys. On its face, the rule applied to all students, but in practice it singled out those who did not conform to gender stereotypes. In opposing dismissal, the plaintiffs explained that the policy sent the student the message that her identity "was so unacceptable that she was literally not fit to appear alongside her fellow classmates' official photos in the yearbook." Pls.' Mem. in Opp'n to Mot. to Dismiss at 12, *Sturgis v. Copiah Cnty. Sch.* Dist., No. 3:10-cv-00564 (S.D. Miss. Sept. 20, 2010). The filing emphasized that a yearbook is no triviality: it is "a rite of passage" and, for many students, "the only time their image ever appears in a book." *Id*. The harm identified was not financial but the lasting denial of equal recognition, belonging, and dignity.

So too in the entertainment industry, where visibility and accurate presentation are inseparable from professional opportunity. A single official image in SAG-AFTRA's voter guide reaches not only union members but also producers, casting directors, and the press. Misrepresentation in this context is not a trivial slight—it reshapes how the actor is perceived across the profession.

Invoking a facially neutral "no animals in photos" rule, Defendant applies it in a way that uniquely burdens disabled members who rely on service animals. For nondisabled actors, cropping out an animal is cosmetic and inconsequential. For Plaintiff, it strips away the visible presence of his service animal—the very marker of his identity

as a disabled actor and his inherent presentation in society—and thereby inscribes stigma into the official record of the profession. Plaintiff's headshot is not a private snapshot; it is the medium through which the entire acting community—from background performers to Academy Award–winning stars—views, recognizes, and interacts with him as a peer.

This reasoning is reinforced by *Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir. 1996), where the Ninth Circuit held that even a facially neutral rule—Hawaii's 120–day dog quarantine—unlawfully excluded disabled people who relied on service animals. Crowder confirms that rules styled as "neutral" can still impose exclusion when they erase the very accommodations that enable equal participation. Similarly, the cropping policy here purports to treat all members equally, but in fact imposes a disproportionate burden on disabled actors, denying them meaningful access to the benefits of membership: accurate representation, professional recognition, and equal participation in the membership.

The parallel is clear: just as the gendered dress code in Sturgis and the quarantine in Crowder purported to apply neutrally to all but in fact imposed disproportionate stigma and structural exclusion, Defendant's cropping policy purports to be neutral while in fact erasing the very accommodation that enables Plaintiff's equal participation. The injury here is not speculative or economic—it is immediate, stigmatizing, and irreparable.

## FACTUAL BACKGROUND

SAG-AFTRA distributes an official Voter Guide to every union member as part of each election cycle. Far from being a routine internal bulletin, this Guide is the union's authoritative, widely distributed communication—garnering attention not only from members but also from industry stakeholders and the press. Major media outlets, including the Los Angeles Times, have covered SAG-AFTRA's election developments, highlighted the high-profile presidential contest that includes actor Sean Astin, who is running for President and Fran Drescher's decision not to seek reelection. Astin is running as part of The Coalition slate—a slate that also includes Plaintiff as a candidate for L.A. Local Board Member and Convention Delegate. [EXHIBIT A]

Thus, Plaintiff's candidacy is not obscure or internal; it is part of the very slate that media outlets and industry professionals have identified as shaping the future direction of the entertainment industry. The Voter Guide therefore operates as a public-facing election record scrutinized not only by members but also by casting directors, producers, and journalists.

By cropping Plaintiff's service animal from his candidate photograph in this widely disseminated Guide, Defendant did not simply enforce a neutral rule. It altered the one official portrayal of a Coalition candidate in a contested, highly publicized election—sending a stigmatizing message to the electorate and the broader industry that Plaintiff's disability accommodation is unworthy of recognition, underscoring how voting outcomes are treated as public events with professional significance.

The Voter Guide features each candidate's photograph alongside biographical details, serving as the sole, union-endorsed presentation of candidacy that is guaranteed to reach every voter and the industry at large. It functions as both a professional representation to peers and an entry point for casting directors, producers, and fans to engage with the candidate's identity.

Plaintiff submitted his photograph accompanied by his service animal—an accommodation essential to his professional capacity and identity as a disabled actor. Despite its critical importance, Defendant applied its facially neutral "no animals" policy and eliminated the service animal from the published version in the Voter Guide.

The difference is not merely cosmetic. For nondisabled members, an absent animal may be unnoticeable. For disabled members whose service animals are an inseparable feature of public functionality and appearance, the cropping communicates exclusion. By removing Plaintiff's service animal, Defendant denied him equal representation in the election and disseminated a public message—viewed by voters, media, and industry dignitaries alike—that his disability identity was unsuitable for inclusion. *Crowder* establishes the doctrine. The dignitary dimension is captured in the ACLU's *Sturgis* litigation, where excluding a student's official portrait under a neutral dress code was

argued to send the message that she was "not fit" to appear with peers (Pls.' Opp. at 12). That same message is inscribed here by cropping Plaintiff's accommodation from the official record.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" never awarded as of right. *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 24 (2008). To obtain such relief, a plaintiff must establish: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. Id. at 20.

In the Ninth Circuit, courts apply these factors flexibly. Where a plaintiff demonstrates "serious questions going to the merits" and a balance of hardships that tips sharply in his favor, an injunction may issue so long as irreparable harm and public interest factors are also satisfied. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). This "sliding scale" approach ensures that the strength of one factor may offset a weaker showing on another, provided all four elements are ultimately met.

Because Plaintiff demonstrates both a likelihood of success on the merits and irreparable harm flowing from ongoing civil rights violations, the requirements for preliminary relief are satisfied.

## I. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

## A. Facially Neutral Policies That Disproportionately Burden People With Disabilities Violate the ADA

The Ninth Circuit has squarely held that a rule can be unlawful even if facially neutral when it denies meaningful access to a program because of disability. In the previously mentioned *Crowder v. Kitagawa*, Hawaii's uniform 120-day animal quarantine "effectively prevent[ed]" blind people who rely on guide dogs from enjoying state services; the court recognized that the barrier itself—not a money loss—was

actionable discrimination and remanded for the required ADA "reasonable modifications" analysis. 81 F.3d 1480, 1483–86 (9th Cir. 1996). That reasoning tracks the Supreme Court's "meaningful access" standard for facially neutral rules in *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

Here, Defendant's cropping practice is framed as "uniform" (a purported "head-and-face only" rule), but its real-world effect is to strip disability-related features (a service dog) from Plaintiff's official election photo while leaving non-disability elements on other candidates' images. As in Crowder, that disproportionate burden denies "meaningful access" to the core program at issue—the official Voter Guide.

**B. The ADA Requires Reasonable Modifications to Policies and Practices; Defendant Cannot Rely on "Uniformity" to Excuse Exclusion**

Under the ADA, covered entities must make reasonable modifications in "policies, practices, or procedures" when necessary to avoid disability-based exclusion unless they prove a fundamental alteration or actual safety risk. See, e.g., *Fortyune v. AMC*, 364 F.3d 1075, 1083–85 (9th Cir. 2004) (movie chain had to adjust seating policy); *Baughman v. Disney*, 685 F.3d 1131, 1135–38 (9th Cir. 2012) (can't categorically ban a mobility device; must assess reasonable modification).

Defendant's asserted interest (image "uniformity") is easily accommodated by accepting Plaintiff's headshot as submitted—precisely the sort of minor policy adjustment *Fortyune* and *Baughman* require. Defendant offers no evidence of safety concerns and no showing that publishing the unaltered photo would "fundamentally alter" the voter guide.

**C. "Meaningful Access" and Program Participation Include Official Representation in the Election Medium**

The Ninth Circuit recognizes that program benefits include the means of participation and effective use—not just physical entry. Likewise, decisions in this Circuit underscore that policies and practices that make participation ineffective or deterring are actionable. See *Civil Rights Educ. & Enf't Ctr. (CREEC) v. HPT*, 867 F.3d

---

1093, 1098–1102 (9th Cir. 2017) (injury where defendant did not offer accessible
transportation services at the hotels it owned; plaintiff merely phoned the hotel to
inquire); *Chapman v. Pier 1 Imports*, 631 F.3d 939, 946–49 (9th Cir. 2011) (en banc)
(standing where a barrier is encountered or deters use).

Here, the program benefit is official, union-funded presentation to every voter via
the Voter Guide. Cropping out Plaintiff's service animal alters the core means of
participation, misrepresents his identity, and deters equal engagement—precisely the sort
of policy-level exclusion the ADA forbids.

**D. The Law Protects Against Visual Exclusion That Sends a Stigmatizing Message**

Courts recognize that rules grounded in—or reinforcing—stereotypes or outdated
norms inflict a legally cognizable dignitary injury. See *Price Waterhouse v. Hopkins*, 490
U.S. 228, 250–52 (1989) (sex-stereotyping is discrimination); *Mississippi Univ. for
Women v. Hogan*, 458 U.S. 718, 724–26 (1982) (rejecting policies that perpetuate
stereotypes); *United States v. Virginia*, 518 U.S. 515, 533 (1996) (state may not "ratify
and reinforce" archaic views). While those are equal-protection/Title VII contexts, their
anti-stereotyping principle accurately describes the harm here: visually excising a service
animal from the only official election image broadcasts that disability-related realities are
unfit for equal representation in the profession's record.

The yearbook litigation in *Sturgis v. Copiah Cnty. Sch. Dist.* (ACLU filings) makes
the same point in a parallel medium: excluding or altering an official photo because it
violates appearance norms conveys that the student is "not fit" to appear with peers,
causing non-monetary, enduring harm to recognition and belonging. (Pls.' Mem. in
Opp'n to Mot. to Dismiss at 12). That advocacy is not precedent, but it persuasively
captures the stigmatic mechanism operating here.

**E. Plaintiff Also Satisfies the Merits Under State Law (CDPA and FEHA)**

CDPA (Cal. Civ. Code §§ 54–55.3; § 54.2) guarantees people with disabilities the
right to be accompanied by service dogs and the full and equal use of "advantages,
facilities, and privileges." Cropping the service animal out of Plaintiff's official photo

penalizes the exercise of that right and denies full and equal use of the union's key electoral "advantage" and "privilege": official candidate presentation to all voters.

Separately, FEHA prohibits disability discrimination by labor organizations in membership benefits and privileges. See Cal. Gov't Code § 12940(b). Altering Plaintiff's official candidacy image in a way that targets disability-related features is differential treatment in the terms, conditions, and privileges of union membership and election participation.

## F. Defendant's Cropping Policy Misrepresents Plaintiff's Identity and Denies Equal Recognition

In *Sturgis v. Copiah County School District*, the ACLU's filing emphasized that a yearbook is "a rite of passage" and, for many students, "the only time their image ever appears in a book." The case settled after the district allowed the portrait's inclusion. The point is instructive: even outside the disability context, courts and litigants have recognized that alteration or exclusion of an official image is no triviality, but a denial of equal recognition and belonging. The injury was not financial but the denial of equal recognition and belonging.

So too in the entertainment industry, where an actor's likeness is inseparable from employability. Courts applying § 43(a) of the Lanham Act have enjoined alterations that distort a performer's identity. See *Gilliam v. Am. Broad*. Co., 538 F.2d 14, 20–21 (2d Cir. 1976) (broadcast of truncated sketches misrepresented comedians' work and approval); *Smith v. Montoro*, 648 F.2d 602, 607–08 (9th Cir. 1981) (false film credit actionable because attribution drives professional reputation and employability).

Defendant's cropping rule does the same kind of damage. For nondisabled actors, removing an animal may be inconsequential. For Plaintiff, it erases the visible presence of his service animal — a defining marker of his identity as a disabled actor — and inscribes stigma into the official record, accessible by the public. Distorting that image communicates a false impression of who Plaintiff is and how he presents himself. The burden to correct is minimal; the reputational harm is lasting.

That is precisely the kind of exclusion by misrepresentation that *Sturgis* shows denies equal belonging, and that *Gilliam* and its progeny confirm is reputational injury the law treats as irreparable. The ADA prohibits no less.

## G. Defendant's "Uniform Rule" Defense Fails as a Matter of Law

"Uniformity" does not save a policy that predictably and uniquely burdens disabled participants. *Crowder* rejected the same move—Hawaii's rule applied to everyone's dogs, yet it disproportionately burdened blind travelers. 81 F.3d at 1483–85. And in the Ninth Circuit's policy-modification line (*Fortyune*; *Baughman*), a neutral-sounding rule must still give way where a reasonable, low-burden modification will avoid discrimination. Defendant also enforces the rule selectively (allowing non-disability deviations such as hats/slogans/novel compositions) while insisting on excising Plaintiff's service animal. That as-applied disparity underscores the ADA problem: the policy functions to erase disability-related identity, not to achieve "uniformity."

## II. IRREPARABLE HARM

"The loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Civil-rights violations are irreparable because they deny equal standing, recognition, and participation—harms that money cannot undo. *Chalk v. U.S. Dist. Ct.*, 840 F.2d 701, 709–10 (9th Cir. 1988); That principle squarely applies here.

Defendant's voter guide is the single official medium through which all of Plaintiff's peers and the industry at large see his image. By cropping Plaintiff's service animal from that photograph, Defendant broadcasts a false and stigmatizing portrayal that denies equal recognition to Plaintiff as a disabled actor. Each day the altered image circulates, the harm compounds. Defendant has issued no correction or retraction, leaving the misrepresentation ongoing and uncured.

Courts recognize three categories of injury, each independently irreparable, and all present here:

*1. Structural Exclusion*

Facially neutral policies that deny meaningful access impose actionable and irreparable harms. In *Alexander v. Choate*, 469 U.S. 287, 301 (1985), the Supreme Court explained that the ADA requires "meaningful access" to programs, not mere formal inclusion. In *Crowder v. Kitagawa*, Hawaii's across-the-board dog quarantine was unlawful because, in practice, it severed blind individuals from their guide dogs and denied equal access to public services.

The same logic applies here. Defendant's "uniform" cropping rule disproportionately burdens disabled members who use visible accommodations. What looks neutral in text functions as exclusion in practice: it erases the very feature that makes equal participation possible. That denial of meaningful access is itself irreparable harm.

*2. Dignitary and Stigmatic Injury*

Courts also recognize that stigma and exclusion from official forums inflict harms that cannot be remedied later. In *United States v. Virginia*, 518 U.S. 515, 532–33 (1996), and Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724–26 (1982), the Court condemned policies that "ratify and reinforce" stereotypes.

So too here. Cropping Plaintiff's service animal from the only official record of membership inscribes stigma into the profession's collective record, signaling that his disability identity is unworthy of equal recognition. No damages award can erase that message once sent.

*3. Professional Identity and Reputation*

For performers, professional identity is their currency. Courts consistently treat misrepresentation of that identity as irreparable. In *Smith v. Montoro*, the Ninth Circuit explained that "being accurately credited for films in which [actors] have played is of critical importance in enabling [them] to sell their 'services,' i.e., their performances." 648 F.2d 602, 607–08 (9th Cir. 1981). Likewise, *Gilliam v. ABC*, 538 F.2d 14, 20–21 (2d Cir. 1976), held that unauthorized edits to Monty Python's work irreparably harmed their

reputational integrity, and *Midler v. Ford Motor Co*., 849 F.2d 460, 463–64 (9th Cir. 1988), recognized that "[t]o impersonate her voice is to pirate her identity."

The same is true here. Defendant's alteration distorts Plaintiff's professional identity in the very forum that defines standing within the union and the industry. Once that image circulates, the reputational diminishment is immediate and irreparable.

**A. Ongoing Injury from Dissemination**

The Guide has already been disseminated and remains online. Each additional view repeats the exclusionary message and compounds reputational injury. Courts enjoin such harms precisely because later remedies cannot "un-publish" the image or re-run the process. *Enyart v. Nat'l Conf. of Bar Examiners*, 630 F.3d 1153, 1165–66 (9th Cir. 2011); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 506 (4th Cir. 2016).

**B. "Neutral" policies that deny "meaningful access" impose cognizable, non-compensable harms.**

Disability law condemns not only overt discrimination but also facially neutral policies that deny "meaningful access." *Alexander v. Choate*, 469 U.S. 287, 301 (1985). In *Crowder v. Kitagawa*, the structure of the policy itself—not any financial loss—was the actionable harm.  Defendant's "uniform" cropping rule works the same way. Only members who use visible accommodations—service animals, wheelchairs, mobility devices—are erased. That is a structural barrier to equal participation in the union's core electoral communication. The injury is the denial of equal representation, not the loss of money, and courts address such harms prospectively, not retrospectively.

**C. ADA cases in this Circuit recognize policy-based exclusions as appropriate targets for injunctive relief.**

Ninth Circuit precedent holds that policies and practices must be modified where they deny equal access, and courts enforce that duty through injunctions because damages cannot compel timely compliance. See *Fortyune v. AMC Theatres*, 364 F.3d 1075, 1083–85 (9th Cir. 2004); *Baughman v. Walt Disney World Co*., 685 F.3d 1131, 1135–38 (9th Cir. 2012). Deterrence and unequal access are concrete injuries. *Chapman v. Pier 1*

*Imports*, 631 F.3d 939, 946–49 (9th Cir. 2011) (en banc). Without injunctive relief here, Defendant's discriminatory policy will continue to shape participation in real time.

**D. Performer-identity injuries are uniquely irreparable.**

Courts have acknowledged that performers' professional identities are distinctive assets, and unauthorized alteration of those identities causes irreparable harm. In *Smith v. Montoro*, the Ninth Circuit explained that actors' careers depend upon accurate presentation and recognition:

> "In the film industry, a particular actor's performance … may be the primary attraction for movie-goers. … Since actors' fees for pictures, and indeed, their ability to get any work at all, is often based on the drawing power their name may be expected to have at the box office, being accurately credited for films in which they have played would seem to be of critical importance in enabling actors to sell their 'services,' i.e., their performances." 648 F.2d 602, 607–08 (9th Cir. 1981).

Other courts have reached the same conclusion: see *Midler v. Ford Motor Co.*, 849 F.2d 460, 463–64 (9th Cir. 1988). These authorities confirm that where a performer's professional presentation is distorted, the harm is not economic but structural: it devalues credibility, reputation, and marketability in ways no damages can restore.

That principle squarely applies here. Plaintiff's official membership image—deliberately cropped to erase his visible accommodation—distorts his professional identity in the very forum that defines standing within the union and the broader industry. Just as removing an actor's credit deprives him of professional recognition, cropping Plaintiff's image deprives him of the ability to present himself authentically to peers. The resulting stigma and reputational diminishment are immediate and irreparable.

**III. THE BALANCE OF EQUITIES TIPS SHARPLY IN PLAINTIFF'S FAVOR**

The equities weigh in Plaintiff's favor. Plaintiff faces reputational and dignitary harm from the circulation of an altered image that stands as his official likeness in the union's records. Courts recognize such injury as irreparable and not compensable by damages. *Chalk v. U.S. Dist.* Ct., 840 F.2d 701, 709–10 (9th Cir. 1988).

Defendant's cropping was applied in the union's official election guide. In that setting, altering Plaintiff's image is not cosmetic but exclusionary: it changes how he is represented to peers, voters, and the industry at large. The point is straightforward: official forums that define membership and identity cannot misrepresent or erase disability without causing immediate, irreparable injury.

ADA precedent points the same way: Title III requires reasonable modification of policies where necessary to ensure equal participation, absent proof of fundamental alteration or safety risk. *Fortyune v. AMC Theatres*, 364 F.3d 1075, 1083–85 (9th Cir. 2004); *Baughman v. Walt Disney World Co*., 685 F.3d 1131, 1135–38 (9th Cir. 2012). The requested relief—correcting Plaintiff's photo to what was submitted—is precisely the kind of minor modification these cases require.

Because Plaintiff's injury is ongoing and intangible, while Defendant's burden is minimal, the balance of equities tips sharply in Plaintiff's favor.

## IV. THE PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF

The public interest is served by ensuring that official records and forums of recognition reflect members accurately and without stigma. Exclusion from an election guide is more than a private slight; it sends a public message about who counts and who does not. The public also has an interest in the integrity of performers' professional identities.

Courts have recognized that reputational integrity is not simply private but a matter of public concern. In *Gilliam*, 538 F.2d 14, 20–21, the court enjoined the broadcast of edited Monty Python sketches, holding that misrepresenting performers' work harmed their professional standing and misled the public.

Federal disability law embodies that same public interest. By requiring reasonable modifications to ensure meaningful access, the ADA protects equal participation in civic and professional life. Enjoining Defendant's cropping practice advances that public purpose by ensuring disabled members are represented on equal terms.

Finally, courts consistently hold that there is no public interest in permitting ongoing violations of federal civil-rights statutes. See *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). Because Plaintiff seeks only narrow, corrective relief that aligns Defendant's policies with established law, the public interest weighs in favor of an injunction.

## CONCLUSION

This case is about more than a photograph. It is about whether civil rights protections can be sidestepped by a rule that appears neutral yet erases the very features that allow disabled individuals equal recognition.

The harm here is immediate and irreparable. As *Crowder*, 81 F.3d 1480, makes clear, a facially neutral policy can still deny meaningful access when it falls uniquely on disabled persons.

Courts and advocates alike have long recognized that exclusion from official images or records inflicts lasting harm to dignity and belonging. The message conveyed here is that Plaintiff's disability-related needs are unworthy of respect or equal representation.

Civil rights law does not permit this. The Supreme Court has emphasized that government action which ratifies stereotypes or demeans identity imposes constitutional injury. The ADA and California civil rights statutes embody the same principle: access is not meaningful unless it is equal, and dignity is not optional in the promise of equality.

Plaintiff does not seek special treatment. He seeks the same recognition afforded to every other member—that his official record reflects him as he is, with the accommodation that ensures his equal participation. Anything less is exclusion in the guise of uniformity.

For these reasons, Plaintiff respectfully asks the Court to grant declaratory and injunctive relief, ensuring that Defendant's policies comply with the ADA and related protections, and reaffirming the principle that civil rights safeguard not only access to

programs, but also the dignity of equal recognition in the institutions that shape professional life.

1. **Declaratory Relief** – Declaring that Defendant's cropping policy, as applied to Plaintiff and other members with disabilities, violates Title III of the Americans with Disabilities Act, the California Disabled Persons Act, the Unruh Civil Rights Act, and the Equal Protection Clause of the Fourteenth Amendment.

2. **Injunctive Relief** – Enjoining Defendant from enforcing or applying its cropping policy in a manner that excludes or erases service animals from members' profile photographs, and requiring Defendant to:

   o (a) accept and maintain profile photographs that accurately depict members with their service animals;

   o (b) reform its membership records policies to ensure full and equal recognition of members with disabilities;

   o (c) provide notice of the revised policies to all members.

3. **Further Relief** – Granting such other and further relief as this Court deems just and proper.

Executed on August 20, 2025, in Los Angeles, California.

/s/Alexander Douglas Plank

Alexander Douglas Plank

c/o Arise Artists Agency

PO Box 930

Manhattan Beach, CA 90267

Phone: (703) 966-8504

Email: alex@alexplank.com

CERTIFICATE OF COMPLIANCE

The undersigned, Plaintiff, certifies that this brief contains 4,248 words, which complies with the word limit of L.R. 11-6.1.

Dated: August 17, 2025

Respectfully submitted,

/s/Alexander Plank

# EXHIBIT A

# Los Angeles Times

HOLLYWOOD INC.

# What's next for SAG-AFTRA as Fran Drescher declines to seek reelection



SAG-AFTRA President Fran Drescher addresses striking writers and actors in a boisterous rally outside Paramount studios in 2023.  (Al Seib/For The Times)

  **By Wendy Lee**
Staff Writer  |  𝕏 Follow

Aug. 11, 2025 1:45 PM PT

Fran Drescher's decision to not run for reelection

as SAG-AFTRA president opens up the race to lead a major Hollywood labor union at a pivotal time as actors face issues such as the rise of AI and a challenging job market two years after a long strike.

Actors Sean Astin and Chuck Slavin are seeking to succeed Drescher in the upcoming election that aims to address concerns about job protections, healthcare and expanding residuals. Astin, known for acting in the "The Lord of the Rings" films, is on SAG-AFTRA's national and local L.A. board, while Slavin is on the union's New England board.

"It's time in this specific situation where we really need reform," Slavin said in an interview. "We're not getting it, because what we're getting right now is a rearrangement of the deck chairs on the Titanic."

Hollywood's entertainment industry has significant obstacles, as companies cut back on production amid studio consolidation and many TV and films are made elsewhere due to lower costs and financial incentives.

Meanwhile, innovation in AI technology has made it easier for artists to create their own visual effects and conceptualization of their ideas

without hiring actors. A tool that has made it more difficult for performers and other entertainment workers to find jobs that are sustainable to live in Southern California.

---



L.A. INFLUENTIAL

**Fran Drescher: Union boss who turned the tables on Hollywood suits**

June 9, 2024

---

Hollywood unions are preparing to negotiate new contracts with major studios next year.

In 2023 — the last contract negotiations — the Writers Guild of America and SAG-AFTRA led dual Hollywood strikes that resulted in companies halting work on many productions. The deals that ended the strikes carved out more pay and AI protections for writers and actors.

Drescher was the face of the actors' strike, delivering a fiery speech that addressed class issues in the entertainment industry. She asked whether Disney Chief Executive Bob Iger was an "ignoramus" after he said actors' demands were not realistic.

SAG-AFTRA's contract, reached after a 118-day strike, brought an estimated $1 billion in gains for

members over three years, according to the union.
The contract included streaming bonuses and AI
protections, including requiring employers to
have consent from actors before creating or using
"digital replicas" and to pay performers if those
replicas were used.

"Here's a woman who's challenging these male
moguls and having to arm wrestle them, knowing
that her own career could be at stake," said
Stephen Galloway, dean of Chapman University's
Dodge College of Film and Media Arts. "She was
fearless."

Drescher, known as the lead character in the
sitcom "The Nanny," had positioned herself as a
nonpartisan leader. She was reelected amid the
strike in 2023, receiving 81% of the votes cast. In
her campaign statement, Drescher said that
"member unity will be my greatest legacy."

---

**HOLLYWOOD INC.**

**Fran Drescher is easily reelected as
SAG-AFTRA president**

Sept. 8, 2023

---

Drescher and SAG-AFTRA pushed for national
and state legislation to bring more AI protections
to performers, including bills that Gov. Gavin

Newsom signed into law last year that gave actors more control over their digital likenesses.

Drescher's decision to not run for reelection became official on Friday when her name did not appear on the voter guide distributed by the union. She did not respond to a request for comment.

Slavin said that while Drescher did a "fine" job, he felt the AI protections in its current contract could have gone a lot farther. The contract ended up getting approved by 78% of the votes cast by SAG-AFTRA's members.

Slavin, who has acted in the movie "Annabelle Hooper and the Ghosts of Nantucket," said his platform will prioritize AI guardrails, equitable contracts for all members regardless of their market size, advocate for better residuals and help protect vulnerable workers.

Astin is running as part of the "The Coalition" slate, which advocates for issues including AI protections, strengthening U.S. production and expanding residuals, according to its website.

Astin's representative did not respond to a request for comment.

*Staff writer Meg James contributed to this report.*

## More to Read

**FOR SUBSCRIBERS**

### Hollywood unions are facing an uphill battle against Trump, AI and the slowdown

Nov. 25, 2024

---

### SAG-AFTRA looks to unionize intimacy coordinators

Sept. 25, 2024

---

### SAG-AFTRA reaffirms 'unwavering commitment' to DEI as Hollywood studios scale back

March 17, 2025



## Wendy Lee

Wendy Lee is an entertainment business reporter, covering streaming services such as Netflix, Amazon Prime Video and Apple TV+. She also writes about podcasting services, digital media and talent agencies.