Susan Davis (*pro hac vice* admitted)
Olivia R. Singer (Calif. Bar No. 312770)
Kayla Morin (*pro hac vice* admitted)
COHEN, WEISS and SIMON LLP
909 Third Avenue, 12th Floor
New York, New York 10022-4869
Tel: (212) 563-4100
sdavis@cwsny.com
*Attorneys for Defendant SAG-AFTRA*

UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

-------------------------------------------------------x

ALEXANDER DOUGLAS PLANK,

                *Plaintiff*,

    - v. -

SAG-AFTRA,

                *Defendant*.

-------------------------------------------------------x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No.
25-cv-07523 (AB) (SSC)

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**Hearing Date:** September 26, 2025
**Time:** 10:00 a.m.
**Judge:** Hon. André Birotte Jr.
**Courtroom:** 7B

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

PRELIMINARY STATEMENT ....................................................................1

FACTS ........................................................................................................2

    The 2025 Election....................................................................................3

    The Voter's Guide and Instructions for SAG-AFTRA Election
    Candidates ..............................................................................................5

    The Practice of Cropping Photographs in Prior SAG-AFTRA
    Elections .................................................................................................7

    The Instant Dispute................................................................................7

ARGUMENT ...............................................................................................9

I.     PLAINTIFF'S REQUEST FOR A MANDATORY INJUNCTION
      AND RELIEF BEYOND THE SCOPE OF THE COMPLAINT
      SHOULD BE DENIED. ......................................................................9

II.    PLAINTIFF HAS NOT SHOWN THAT HE IS ENTITLED TO THE
      "EXTRAORDINARY REMEDY" OF A PRELIMINARY
      INJUNCTION. ...................................................................................12

    A.    Plaintiff has not established that he is likely to suffer irreparable
          harm.................................................................................................12

    B.    Plaintiff is not likely to succeed on the merits of his claims. .............14

          i.     *Plaintiff lacks standing to pursue his ADA claim.* ...................15

          ii.    *Plaintiff is not likely to succeed on the substantive merits
              of his disability claims.* .............................................................17

          iii.   *The Court should decline to exercise supplemental
              jurisdiction over Plaintiff's state-law claims.* ...........................20

    C.    The public interest and balance of equities weigh against
          injunctive relief. .................................................................................21

Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Preliminary Injunction

1

CONCLUSION ..................................................................................................22

CERTIFICATE OF COMPLIANCE .................................................................24

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Preliminary Injunction

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Alexander v. Choate*,
   469 U.S. 287 (1985)..................................................................................19

*Allen v. Cellco P'ship*,
   No. 24-4573, 2025 WL 1367824 (9th Cir. May 12, 2025) ...............................16

*Am. Fed'n of State Cnty. & Mun. Emps. v. United Domestic Workers of Am.*,
   No. 05CV1251BTM(POR), 2005 WL 8173329 (S.D. Cal. June 30, 2005) ......21

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
   750 F.2d 1470 (9th Cir. 1985) ...................................................................13

*Am. Rivers v. Nat'l Marine Fisheries Serv.*,
   126 F.3d 1118 (9th Cir. 1997) ...................................................................10

*Asmoke USA, LLC v. YCY Int'l Logistics, Inc.*,
   No. SACV2300746CJCADSX, 2023 WL 3768655 (C.D. Cal. May 1, 2023)..................................................................................................14

*Atiyeh v. Am. Bus. Bank*,
   No. 8:25-CV-00062-AB-KES, 2025 WL 1090322 (C.D. Cal. Feb. 24, 2025)..................................................................................................12

*Baughman v. Walt Disney World Co.*,
   685 F.3d 1131 (9th Cir. 2012) ...................................................................19

*Bell Atl. Bus. Sys. Servs., Inc. v. Hitachi Data Sys. Corp.*,
   856 F.Supp. 524 (N.D. Cal. 1993).............................................................11

*Borenstein v. Lead Animal Shelter Animal Found.*,
   810 F. App'x 573 (9th Cir. 2020)...............................................................11

*Borodaenko v. Twitter, Inc.*,
   No. 22-CV-07226-HSG, 2023 WL 3294581 (N.D. Cal. May 5, 2023)............18

*C.R. Educ. & Enf't Ctr. v. Hosp. Props. Tr.*,
   867 F.3d 1093 (9th Cir. 2017) ...................................................................19

*Calhoon v. Harvey*,
   379 U.S. 134 (1964)..................................................................................21

iii

*Caribbean Marine Servs. Co., Inc. v. Baldridge,*
  844 F.2d 668 (9th Cir. 1988) ............................................................ 12

*Carnero v. Elk Grove Fin., LLC,*
  No. 16-CV-03606-BLF, 2016 WL 6873544 (N.D. Cal. Nov. 22, 2016) .......... 21

*Chapman v. Pier 1 Imports (U.S.) Inc.,*
  631 F.3d 939 (9th Cir. 2011) ............................................................ 19

*Crowder v. Kitagawa,*
  81 F.3d 1480 (9th Cir. 1996) ............................................................ 19

*Cullen v. Netflix, Inc.,*
  880 F.Supp.2d 1017 (N.D. Cal. 2012) ................................................. 16

*Dept. of Parks & Recreation for State of Cal. v. Bazaar del Mundo Inc.,*
  448 F.3d 1118 (9th Cir. 2006) .......................................................... 11

*Doe v. CVS Pharmacy, Inc.,*
  982 F.3d 1204 (9th Cir. 2020) .......................................................... 17

*Erasmus v. Chien,*
  650 F.Supp.3d 1050 (E.D. Cal. 2023) ................................................. 16

*Fortyune v. Am. Multi-Cinema, Inc.,*
  364 F.3d 1075 (9th Cir. 2004) .......................................................... 19

*Frontline Med. Assocs., Inc. v. Coventry Healthcare Workers Comp., Inc.,*
  620 F.Supp.2d 1109 (C.D. Cal. 2009) ................................................. 13

*Garcia v. Google, Inc.,*
  786 F.3d 733 (9th Cir. 2015) ................................................ 11, 12, 14

*Arizona ex rel. Goddard v. Harkins Amusement Enterprises, Inc.,*
  603 F.3d 666 (9th Cir. 2010) ............................................................ 16

*Gomez v. Miersch,*
  No. 21-CV-08936-CRB, 2022 WL 1271009 (N.D. Cal. Apr. 28, 2022)
    ..................................................................................... 17, 20

*Gomez v. Smith,*
  No. 21-CV-07154-RS, 2022 WL 117763 (N.D. Cal. Jan. 12, 2022) ............. 15

*Int'l Tech. Univ. Found. v. WASC Senior Coll. & Univ. Comm'n,*
  No. 22-CV-04576-BLF, 2023 WL 2621344 (N.D. Cal. Mar. 23, 2023) .......... 10

iv

*LA All. for Hum. Rts. v. Cnty. of Los Angeles*,
    14 F.4th 947 (9th Cir. 2021) ...................................................................10, 11, 15

*Lopez v. Pac. Mar. Ass'n*,
    657 F.3d 762 (9th Cir. 2011) ...........................................................................18

*McColm v. Hearst Corp.*,
    No. C01-3266SI, 2001 WL 1112204 (N.D. Cal. Sept. 17, 2001) .....................17

*Oakland Trib., Inc. v. Chron. Pub. Co.*,
    762 F.2d 1374 (9th Cir. 1985) .........................................................................14

*Oliver v. Ralphs Grocery Co.*,
    654 F.3d 903 (9th Cir. 2011) ...........................................................................20

*Ontel Prods. Corp. v. Brownstone Res., LLC*,
    No. SACV2101359JVSDFMX, 2021 WL 6103538 (C.D. Cal. Aug. 20,
    2021) ...............................................................................................................13

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
    810 F.3d 631 (9th Cir. 2015) ...........................................................................10

*Pollara v. Radiant Logistics Inc.*,
    No. CV 12-0344 GAF (SPX), 2012 WL 12887095 (C.D. Cal. Sept. 13,
    2012) ...............................................................................................................17

*Stern v. Sony Corp. of Am.*,
    459 F. App'x 609 (9th Cir. 2011) .....................................................................16

*Sturgis v. Copiah Cnty. Sch. Dist.*,
    No. 3:10-CV-455-DPJ-FKB, 2011 WL 4351355 (S.D. Miss. Sept. 15,
    2011) ...............................................................................................................19

*Treanor v. Washington Post Co.*,
    826 F.Supp. 568 (D.D.C. 1993) .......................................................................16

*United Steelworkers of Am. v. Sadlowski*,
    457 U.S. 102 (1982) .........................................................................................22

*Verse v. Scott*,
    No. CV-25-01581-PHX-KML, 2025 WL 1425005 (D. Ariz. May 16,
    2025) ...............................................................................................................20

*Volis v. City of Los Angeles Hous. Auth.*,
    No. CV1301397MMMSPX, 2014 WL 12704885 (C.D. Cal. Jan. 7, 2014) ......13

v

*Weyer v. Twentieth Century Fox Film Corp.*,
   198 F.3d 1104 (9th Cir. 2000) ............................................................ 16, 17

*Whitaker v. Starbucks Corp.*,
   No. CV 19-6583-GW-SKX, 2019 WL 13528318 (C.D. Cal. Nov. 25,
   2019) .......................................................................................................... 19

*Whitaker v. Yard House*,
   No. SACV192290JVSJDEX, 2020 WL 3805807 (C.D. Cal. Mar. 23,
   2020) .......................................................................................................... 20

*Williams v. Lobel Fin. Corp.*,
   673 F.Supp.3d 1101 (C.D. Cal. 2023) .................................................... 12

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................ 12, 14, 21

*Zimmerman v. Oregon Dep't of Just.*,
   170 F.3d 1169 (9th Cir. 1999) ................................................................ 18

**Federal Statutes**

29 U.S.C.
   § 481 *et seq.* ................................................................................................. 4

42 U.S.C.
   § 12101 *et seq.* ........................................................................................... 15
   § 12181(7) ................................................................................................... 16
   § 12182(a) ................................................................................................... 15

ADA Title II ................................................................................................ 17, 18

ADA Title III ........................................................................................ 15, 16, 17

Labor-Management Reporting and Disclosure Act Title IV ..................... 1, 2, 4, 5

Rehabilitation Act ............................................................................................. 19

**California Statutes**

Cal. Civ. Code § 54(a) ...................................................................................... 18

California Disabled Persons Act, Cal. Civil Code § 54 *et seq.* ....................... 15

California Fair Employment and Housing Act, Cal. Gov't Code
   § 12900 *et seq.* ........................................................................................... 15

**Other Authorities**

29 C.F.R. § 452 *et seq.*...............................................................................................4

29 C.F.R. § 452.67......................................................................................................5, 7

29 C.F.R. § 452.69......................................................................................................5, 7

29 C.F.R. § 452.69.........................................................................................................5

## PRELIMINARY STATEMENT

This action challenges and seeks to enjoin a decision made by a union, SAG-AFTRA, after the ballots have been counted in a national union election, a matter within the exclusive jurisdiction of the United States Department of Labor. Plaintiff claims that by cropping his photo in the Voter's Guide that was mailed to eligible voters on August 13, 2025, so that only a headshot appears—as it does with every other photo submitted and in accordance with Department of Labor regulations and SAG-AFTRA policies—SAG-AFTRA discriminated against him on the basis of his disability. As discussed below, this argument is baseless.

The facts underlying Plaintiff's claims are undisputed. SAG-AFTRA has maintained an unbroken practice in its last six biennial elections of only including headshots, together with 100-word candidate statements, in its Voter Information Guide ("Voter's Guide"). Its practice, approved by the Los Angeles Local Union ("LA Local") Election Committee and uniformly applied, is clearly explained to candidates in advance. The LA Local Voter's Guide, which is paid for by SAG-AFTRA, contains more than 100 identically sized statements and photos of candidates running in the national and LA Local election. SAG-AFTRA pays for the printing and mailing of the Voter's Guide to supplement candidate mailings and e-mailings that are paid for by individual candidates.

The requirement of maintaining uniformity in the type and size of candidates' photos is necessary to ensure that all candidates are treated equally, a requirement of Title IV of the Labor-Management Reporting and Disclosure Act ("LMRDA") when a union pays for a campaign mailing. When candidates submit photographs that contain more than their headshots, which occurs quite frequently, SAG-AFTRA crops the photographs so that they only contain a headshot, as required in the candidate instructions. Plaintiff claims that SAG-AFTRA acted discriminatorily in removing his service animal and only including his headshot in his photograph. Essentially, Plaintiff seeks to compel SAG-AFTRA to act contrary

1

to its obligations under Title IV of the LMRDA and its own governing documents by treating *him* differently from every other candidate.

As this Court found in denying his motion for a temporary restraining order ("TRO"), Plaintiff has failed to satisfy the extremely high threshold for the issuance of a preliminary injunction, particularly because he now seeks a mandatory injunction. Not only is Plaintiff unlikely to succeed on the merits of any of his claims, but he has failed to provide any evidence that he is likely to suffer irreparable harm. Thus, for the reasons discussed below, Plaintiff's application for a preliminary injunction should be denied.

## **FACTS**

The following facts are primarily drawn from the August 15, 2025 Declaration of Michelle Bennett and SAG-AFTRA's Memorandum of Points and Authorities in Opposition to Plaintiff's TRO Motion. For the Court's ease of reference, they are set forth below.

SAG-AFTRA, a national labor organization representing more than 160,000 members, was formed on March 30, 2012 as a result of the merger of the Screen Actors Guild ("SAG") and the American Federation of Television and Radio Artists ("AFTRA"). *See* September 5, 2025 Declaration of Michelle Bennett ("Bennett Decl.") ¶ 3. SAG-AFTRA's members include actors, broadcasters, recording artists, and other media professionals across the United States. *Id*.

Plaintiff, Alexander Douglas Plank, is a member of SAG-AFTRA's LA Local. *Id.* ¶ 8. Plaintiff ran for a seat on the LA Local Board, as well as for a Convention Delegate position, in the 2025 SAG-AFTRA LA Local election (the "2025 Election"). *Id.*; *see also* Complaint ("Compl."), Dkt. No. 1 at 14.[1]

SAG-AFTRA has a longstanding commitment to disability rights. It has a separate Equity & Inclusion Department to address bias and inequities its

---

[1] This citation refers to the PDF pagination.

members experience and to ensure that every member is treated with dignity and respect. *Id.* ¶ 4. One of the Department's central focuses is on advocating for and protecting the rights of performers with disabilities. *Id.* Additionally, SAG-AFTRA has a Performers with Disabilities Committee that works to promote full access and inclusion in all areas of SAG-AFTRA's jurisdiction for performers with disabilities. *Id.* ¶ 5. Last October, for example, SAG-AFTRA launched a series of video vignettes designed to refute some common stereotypes that performers with disabilities face in the entertainment industry. *Id.* ¶ 6, Exhibit ("Ex.") A. Many of SAG-AFTRA's Locals, including the LA Local, also have established committees whose mission is to promote and protect the rights of performers with disabilities. *Id.* ¶ 7.

The 2025 Election

On September 12, 2025, SAG-AFTRA will have completed its internal election for national officers, national Board members, local officers, local Board members, and Convention Delegates. *Id.* ¶ 9. This is the seventh regularly scheduled biennial election that SAG-AFTRA has held since the 2012 merger of SAG and AFTRA. *Id.* The elections were conducted by an independent election firm, Integrity Voting Systems ("IVS"). *Id.* Michelle Bennett, Chief Governance and Equity & Inclusion Officer ("Bennett"), was responsible for the internal administration of the election. *Id.* ¶¶ 2, 9. Her election duties included overseeing the mechanics of the national and 25 affiliated Local elections, supervising the preparation of the Voter's Guide, and coordinating the elections balloting and tabulations with IVS. *Id.* ¶ 9.

The LA Local Election was also overseen by the LA Local Election Committee, a five-member committee appointed by the LA Local Board. *Id.* ¶ 10. Specifically, the LA Local's Constitution provides for the establishment of a Local Election Committee to oversee all elections consistent with the SAG-AFTRA

Constitution and SAG-AFTRA policies and procedures.  *Id.*, Ex. B.  Article 5.6 of the LA Local's Constitution states, in relevant part:

> The Local Board shall establish a Local Elections Committee to oversee all nomination procedures and elections consistent with the SAG-AFTRA Constitution and SAG-AFTRA policies and procedures.  The decision of the Local Elections Committee on all election matters shall be final.

LA Local Constitution Article 5.6.

The election period in the LA Local began on May 9, 2025, when SAG-AFTRA sent its "Calling all Candidates" notice of nominations and election to all members of the LA Local.  *Id.* ¶ 12, Ex. D.  The nominating period closed on July 11, 2025.  *Id.*  On August 13, 2025, IVS mailed ballots to the LA Local's 56,567 eligible members.  *Id.*  The Voter's Guide, discussed in detail below, went to print on August 8th and was included in the ballot package mailed to eligible members on August 13th.  *Id.*  The ballots will be counted on September 12, 2025. *Id.*, Ex. D at D-2.

Internal union elections are highly regulated by the United States Department of Labor ("DOL"), which has exclusive jurisdiction over virtually all disputes concerning these elections.  29 U.S.C. § 481 *et seq.* ("Title IV").  On March 15, 2025, consistent with the requirements of Title IV and its extensive accompanying regulations, 29 C.F.R. § 452 *et seq.*, the SAG-AFTRA National Board adopted a Nominations and Election Policy (the "Election Policy") that contained the specific rules governing the 2025 Election.  Bennett Decl. ¶ 13, Ex. E.  The Election Policy, as well as a comprehensive set of candidate instructions, was posted on SAG-AFTRA's website on May 8, 2025.  *Id.*, Ex. F.   The Calling All Candidates Notice also notified all candidates that additional requirements for the submission of materials would be described online.  *Id.*

<u>The Voter's Guide and Instructions for SAG-AFTRA Election Candidates</u>

DOL Regulations and the Election Policy give candidates the right to mail or email campaign literature to all eligible voters at their own expense. 29 C.F.R. §§ 452.67–69; Election Policy Article III.B. Additionally, although not required by Title IV or its regulations, SAG-AFTRA incurs the cost of distributing to the eligible voters a Voter's Guide, which contains a headshot and 100-word statement from each candidate. Bennett Decl. ¶ 11. For the 2025 Election, SAG-AFTRA spent more than $130,000 on printing and mailing the Voter's Guide. *Id*.

Where, as here, a union "distributes any candidate's literature without charge . . . , all other candidates are entitled to have their literature distributed *on the same basis*." 29 C.F.R. § 452.69 (emphasis added). To ensure that all candidates who submit statements and photos for the Voter's Guide are treated equally, the Election Policy contains strict rules for the size and format of each candidate's statement and photograph. With respect to the statement, Article III.A.1.b of the Election Policy provides, in relevant part:

> b) Candidate Statements
>
> Candidates may submit a statement in a single paragraph form of not more than one hundred (100) words that will be published, together with the candidate's photo, in the Guide. Candidates' statements and photos will be listed in the Guide in the same order as they appear on the ballot. The Guide shall contain a statement that all candidates were afforded the right to submit statements and photos in accordance with this Nominations and Election Policy.

Election Policy Article III.A.1.b.

Article III.A.1.a of the Election Policy, which concerns candidate photographs to be included in the Voter's Guide, provides, in relevant part:

> a) Photos
>
> 1. Non-Convention Delegate candidates may submit a campaign photo for use in the Voter Information Guide (the "Guide") that will be distributed by SAG-

5

AFTRA to members in good standing together with the mail ballots. Candidates seeking to have their photos used in the Guide must sign a photo release and indemnification form. *Photos submitted for the Guide must be of the candidate running*, and must be in the form of a photograph and not an illustration of any kind. Further, political messaging may not be included.

*Id.* at Article III.A.1.a (emphasis added).

The Instructions for SAG-AFTRA Election Candidates ("Candidate Instructions"), which are posted on SAG-AFTRA's website, provide more specific directions to candidates about their statements and photos in order to ensure that there is no disparity in how candidates are being treated in the union-funded publication. Bennett Decl. ¶ 16, Ex. F. With respect to photos, Article 1.K of the Candidate Instructions requires that candidates submit a "headshot," which is defined as "a photograph of a person's head and face." *Headshot*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/headshot (last visited Sept. 5, 2025). Article 1.K states:

K.    Photo/Headshot

i.    Candidates running for National Board, Local Officer, Local Board or Convention Delegate seats may submit a photo/headshot for the voter's guide (an electronic jpeg format with a resolution greater than 200 dpi is preferred). . . .

ii.    One (1) photo/headshot for all positions in the voter's guide may be submitted through the online nominating portal or offline by email to laelections@sagaftra.org.

iii.    Candidates must supply a new photo/headshot (not an illustration) for the voter's guide even if you have previously provided a photo/headshot in connection with former elections or for other SAG-AFTRA purposes.

Candidate Instructions Article 1.K.

1        To comply with Title IV's requirements that all candidates be treated

2  "equally" and "under the same conditions," 29 C.F.R. §§ 452.67, 452.69, the

3  Candidate Instructions which provide that all photos contain only a headshot of the

4  candidate, and Article III.A.1 of the Election Policy which allows for a photo "of

5  the candidate running," both IVS and SAG-AFTRA staff cropped all candidate

6  photographs to a uniform size that includes only a headshot.  Bennett Decl. ¶ 17.

7  This cropping practice was approved by the LA Local Election Committee on

8  August 7, 2025.  *Id.*, Ex. G.  Pursuant to the LA Local Constitution, this decision

9  was final.  *Id.* ¶ 17; Ex. B.

10  The Practice of Cropping Photographs in Prior SAG-AFTRA Elections

11        In the six prior biennial elections held since the 2012 merger of SAG

12  and AFTRA, SAG-AFTRA's Election Policy and Candidate Instructions required

13  that all candidate photographs contain only a headshot of the candidate running.

14  *Id.* ¶ 18.  Consistent with this, both IVS and SAG-AFTRA staff have cropped

15  thousands of candidate photographs to ensure that they contain only a headshot of

16  the candidates.  *Id.*  Notably, as occurred here, in the 2017, 2019, 2021, and 2023

17  elections, one candidate, Joanna Leeds, who submitted a photograph with her dog

18  had her photograph cropped to remove the dog and include only her headshot.  *Id.*,

19  Exs. H–L.

20  The Instant Dispute

21        On August 8, 2025, Plaintiff wrote to Bennett and expressed his

22  displeasure with the fact that his service animal would not appear in his

23  photograph.  *Id.* ¶ 19, Ex. M.  Plaintiff stated that he had "hoped to use [his]

24  position on the board to advocate for disabled performers, especially those with

25  service animals."  *Id.*, Ex. M.  Plaintiff's 100-word statement, however, which

26  accompanied his photograph in the Voter's Guide, clearly set forth his position on

27  this issue:

28

> Once elected, I will be the only member of leadership with a service dog.  As an autistic actor and disability rights activist, I have a passion for improving things for marginalized performers.  Having served as a strike captain and on the performers with disabilities and communications committees, I'm excited to continue to work to bring SAG-AFTRA into the modern era by increasing our union organizing efforts, building solidarity, and improving future negotiations so that our members have opportunities in a rapidly changing world.  **TheCoalition2025.org**

Ex. C, at C-4.  Additionally, the link in his statement was to a website that included a photograph of Plaintiff *with his service animal*.  *Id.*

Bennett sent Plaintiff an email less than an hour later, stating:

> Thank you for reaching out to me. I want to assure you that the Union does not stand for disability erasure and that the photo was cropped only to align with SAG-AFTRA's Nominations & Election Policy and the candidate instructions which specify that all photos submitted for the voter's guide must be a headshot of the candidate. . . .

> We are always open to suggestions for improving the Union's rules and policies.  We will certainly add this to the list of recommendations to be considered and approved for future election cycles.

Bennett Decl. ¶ 19, Ex. M.

As reflected in Plaintiff's email, in each election cycle, SAG-AFTRA receives suggestions for changes to its Election Policy and related procedures.  *Id.* ¶ 20.  SAG-AFTRA leaders and staff, including Bennett, discuss these suggestions prior to the next election cycle and, where appropriate, make recommendations to SAG-AFTRA's National Board for approval of any changes.  *Id.*  As Bennett indicated to Plaintiff in her August 8th email, Bennett added his suggestion about including service animals in campaign photos to the list of recommendations to be considered for future election cycles.  *Id.*

8

Plaintiff wrote back to Bennett later on August 8, 2025, again protesting the cropping of his service animal from his photograph and asking when the Voter's Guide was being mailed.  *Id*. ¶ 21.  Bennett advised Plaintiff on August 12, 2025 that the Voter's Guide was being mailed the next day, and stated:

> [T]he photo was cropped only to align with SAG-AFTRA's Nominations & Election Policy and the candidate instructions, which specify that all photos submitted for the Voter's Guide must be a headshot of the candidate.  All candidate photos have been cropped to comply with this Rule. The Election Committee does not have the authority to make any exceptions to the rules set forth in the SAG-AFTRA Nominations and Election Policy; it only has the authority to determine whether the candidate requirements have been met.

*Id*. SAG-AFTRA mailed the Voter's Guide to the more than 50,000 LA Local eligible voters beginning at 12:24 p.m. Pacific Time on August 13, 2025, with the last delivery taking place at 3:27 p.m.  *Id*. ¶ 22.  That afternoon, via an email Plaintiff sent after the last delivery, SAG-AFTRA learned of this action.  *Id*.; Ex. N.

## ARGUMENT

## I.   PLAINTIFF'S REQUEST FOR A MANDATORY INJUNCTION AND RELIEF BEYOND THE SCOPE OF THE COMPLAINT SHOULD BE DENIED.

In Plaintiff's initial TRO Motion, he sought, *inter alia*, an order enjoining SAG-AFTRA from mailing its Voter's Guide.  *See* TRO Motion, Dkt. No. 4 at 2–3.  This mirrored the relief sought in the Complaint.  *See* Compl. at 6 (Prayer for Relief).  When Plaintiff filed this lawsuit, however, because SAG-AFTRA had already mailed the Voter's Guide, this Court determined that Plaintiff's requested relief was moot.  *See* TRO Order, Dkt. No. 20 at 3–4.  Now, by the time the Court considers Plaintiff's Preliminary Injunction Motion ("PI Motion"), Dkt. No. 30, the LA Local Election will have concluded, and therefore

9

1  any election-related relief Plaintiff seeks will also be moot.  Bennett Decl., Ex. D at

2  D-2 (all ballots must be received by, and will be counted on, September 12, 2025);

3  *see Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997)

4  (an issue is moot "[i]f an event occurs that prevents the court from granting

5  effective relief").

6            Apparently recognizing this deficiency in his application, Plaintiff

7  now seeks an order (1) enjoining SAG-AFTRA "from enforcing or applying its 'no

8  animals in photos' policy in a way that excludes or erases service animals from

9  members' official photographs," and (2) requiring SAG-AFTRA to "accept and

10  maintain Plaintiff's authentic image, including his service animal, for use in union

11  records and publications."  Proposed Order, Dkt. No. 30-1 at 1–2; *see also* PI

12  Motion at 14 (requesting, *inter alia*, that SAG-AFTRA "reform its membership

13  records policies").

14            The result of this reframing, however, is that Plaintiff now seeks relief

15  far beyond that sought or even contemplated in the Complaint, which focuses

16  exclusively on the alleged harm to Plaintiff as it related to the 2025 Election and

17  Voter's Guide.  *See generally* Compl.  For a federal court to issue a preliminary

18  injunction, the injunction must grant "relief of the same character as that which

19  may be granted finally."  *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810

20  F.3d 631, 636 (9th Cir. 2015).  "Absent that relationship or nexus, the district court

21  lacks authority to grant the relief requested."  *Id.*

22            The relief Plaintiff requests in the PI Motion, which requires SAG-

23  AFTRA to use Plaintiff's image with his service dog in *all* union records and

24  publications, is well outside the relief sought in the Complaint.   As such, this

25  Court does not have the authority to grant the relief requested.  *See Int'l Tech.*

26  *Univ. Found. v. WASC Senior Coll. & Univ. Comm'n*, No. 22-CV-04576-BLF, 2023

27  WL 2621344, at *2 (N.D. Cal. Mar. 23, 2023) (denying TRO motion where TRO

28  "seeks different relief than the relief sought in [the] complaint").

1    The reframing also effectively transforms Plaintiff's requested relief

2   into a mandatory injunction, i.e., one that requires SAG-AFTRA "to take

3   affirmative action," rather than a prohibitory injunction, which preserves the status

4   quo.  *See Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015) (preliminary

5   injunction ordering Google to remove video from YouTube was a mandatory

6   injunction because it ordered Google to "take action"). Mandatory injunctions are

7   "particularly disfavored," and a plaintiff seeking one must establish that the "law

8   and facts *clearly favor* her position, not simply that she is likely to succeed." *Id.*

9    Here, the status quo preceding Plaintiff's litigation consisted of SAG-

10   AFTRA's unbroken practice of applying its cropping practice to all candidate

11   photos.  Bennett Decl. ¶¶ 17–18; *Dept. of Parks & Recreation for State of Cal. v.*

12   *Bazaar del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006) (relevant status quo is

13   "the last uncontested status that preceded the parties' controversy").  But in his

14   latest filing, Plaintiff asks the Court to order SAG-AFTRA to accept Plaintiff's

15   "authentic image," which he deems to include his service dog, in *all* union

16   publications, affirmative actions that have nothing to do with the subject matter of

17   the Complaint and would require SAG-AFTRA to alter its union-wide practices

18   from the status quo.  *See* Proposed Order at 1–2; *cf. Borenstein v. Lead Animal*

19   *Shelter Animal Found.*, 810 F. App'x 573, 573–74 (9th Cir. 2020) (request for an

20   injunction "undoing an alleged past act of discrimination" was a mandatory

21   injunction); *Bell Atl. Bus. Sys. Servs., Inc. v. Hitachi Data Sys. Corp.*, 856 F.Supp.

22   524, 525 (N.D. Cal. 1993) (plaintiff sought mandatory injunction where he

23   requested relief that would force defendant to violate its policy).

24    Because Plaintiff's requested relief—that SAG-AFTRA affirmatively

25   change its practice with respect to all photos, not just those in the Voter's Guide—

26   is different from that sought in the Complaint, Plaintiff's PI Motion must fail.

27   Moreover, even if the Court determines that a sufficient nexus exists between the

28   Complaint and PI Motion, Plaintiff's requested relief is a quintessential request for

11

a mandatory injunction.  As discussed below, Plaintiff cannot satisfy the already substantial burden required for a prohibitory injunction, much less the elevated standard governing mandatory injunctive relief.

## II. PLAINTIFF HAS NOT SHOWN THAT HE IS ENTITLED TO THE "EXTRAORDINARY REMEDY" OF A PRELIMINARY INJUNCTION.

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Williams v. Lobel Fin. Corp.*, 673 F.Supp.3d 1101, 1105 (C.D. Cal. 2023) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).  A plaintiff seeking a preliminary injunction must show "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm absent preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).  Where, as here, a party seeks a mandatory injunction, they must show that the law and facts "clearly favor" their position, not merely a likelihood of success.  *Garcia*, 786 F.3d at 740.

### A. Plaintiff has not established that he is likely to suffer irreparable harm.

As with a TRO, a plaintiff seeking a preliminary injunction must show that they are likely to suffer irreparable harm in the absence of an injunction.  *See Winter*, 555 U.S. at 20.  The standard for establishing irreparable harm is exacting: "A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co., Inc. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988).  This means that a plaintiff must provide "factual support beyond the allegations of the complaint," in the form of probative evidence showing that he is facing imminent, irreparable harm.  *Atiyeh v. Am. Bus. Bank*, No. 8:25-CV-00062-AB-KES, 2025 WL 1090322, at *2 (C.D.

Cal. Feb. 24, 2025); *Volis v. City of Los Angeles Hous. Auth.*, No. CV1301397MMMSPX, 2014 WL 12704885, at *3–4 (C.D. Cal. Jan. 7, 2014) (collecting cases where plaintiffs failed to produce evidence necessary to establish irreparable harm).

While Plaintiff expands on his theories of irreparable harm in the PI Motion, he has again failed to include any evidence connecting those theories to the irreparable harm he claims *he* suffers. *See, e.g.*, *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (irreparable harm not established by "conclusory" statements "without sufficient support in facts"). For example, Plaintiff cites trademark and tort cases for his theory that harm to his professional reputation is irreparable, PI Motion at 9–11, but he fails to draw a sufficient connection between those cases and how the harm actually has manifested in his case. *See Ontel Prods. Corp. v. Brownstone Res., LLC*, No. SACV2101359JVSDFMX, 2021 WL 6103538, at *6 (C.D. Cal. Aug. 20, 2021) ("theoretical arguments" were "insufficient to show a likelihood that such harm will be likely, substantial, and immediate").

Significantly, although Plaintiff's theories of irreparable harm hinge on the supposed erasure of his identity as a disabled person, he conspicuously fails to acknowledge that immediately opposite his photo in the Voter's Guide is a 100-word statement that begins with "Once elected, I will be the only member of leadership with a service dog," and ends with a link to his campaign website, where he is featured in a photo with his service dog. Bennett Decl. ¶ 19, Ex. C at C-4. Plaintiff does not even attempt to explain how he is harmed—let alone irreparably harmed—from the inclusion of his photo in the Voter's Guide *alongside* a statement that highlights his activism for disability rights and links to a website that contains the precise photograph at issue here. *Cf. Frontline Med. Assocs., Inc. v. Coventry Healthcare Workers Comp., Inc.*, 620 F.Supp.2d 1109, 1110–1111 (C.D. Cal. 2009) (rejecting plaintiff's argument that he faced reputational harm,

and finding no irreparable harm where plaintiff failed to provide any explanation or proof for the alleged injury his business faced).  At most, Plaintiff's contentions are speculative theories as to what harm he *could* suffer from having his cropped photograph in the Voter's Guide; they are not probative pieces of evidence that the harm is immediate and likely to occur.  *See Asmoke USA, LLC v. YCY Int'l Logistics, Inc.*, No. SACV2300746CJCADSX, 2023 WL 3768655, at *2 (C.D. Cal. May 1, 2023) ("speculative and conclusory allegation" of reputational harm insufficient to establish irreparable harm absent any supporting evidence).

Consistent with what this Court found in denying his TRO Motion, Plaintiff's theoretical, speculative assertions of irreparable harm do not justify the extraordinary remedy of a preliminary injunction.  Accordingly, his application for a preliminary injunction should be denied.

**B.    Plaintiff is not likely to succeed on the merits of his claims.**

A plaintiff seeking a preliminary injunction must also establish that there is a likelihood of success on the merits of their claims, *Winter*, 555 U.S. at 20, or, where seeking a mandatory injunction, that the law and facts "clearly favor" their position, *Garcia*, 786 F.3d at 740.  Where a plaintiff has not demonstrated irreparable harm, a court need not assess whether they are likely to prevail on the merits.  *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1378 (9th Cir. 1985).  Nevertheless, even assuming *arguendo* that Plaintiff's claims are considered on the merits, he has neither demonstrated a likelihood of success on the merits nor that the law and facts clearly favor his position.

As a threshold matter, Plaintiff appears to move for a preliminary injunction based on his federal and state-law disability claims, not on his

14

constitutional or tort claims.[2]  PI Motion at ii.  He brings those disability claims pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12900 *et seq.*, and the California Disabled Persons Act ("CDPA"), Cal. Civil Code § 54 *et seq.*

> i.    *Plaintiff lacks standing to pursue his ADA claim.*

To establish standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *LA All. for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 956 (9th Cir. 2021).  A plaintiff seeking a preliminary injunction "must make a clear showing of each element of standing." *Id.* at 956–57.  "Standing for an ADA claim has additional nuances, which are connected to what a plaintiff must show to prevail on the merits of an ADA claim." *Gomez v. Smith*, No. 21-CV-07154-RS, 2022 WL 117763, at *1 (N.D. Cal. Jan. 12, 2022).

Here, Plaintiff's primary theory appears to be grounded in Title III of the ADA.  *See* PI Motion at 12.  Title III of the ADA prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).  To prevail on a Title III claim, a plaintiff must show "(1) he is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public accommodations by the

---

[2] If Plaintiff intends to move for a preliminary injunction on his constitutional and tort claims, those claims are also likely to fail for the reasons discussed in SAG-AFTRA's TRO Opposition.  *See* TRO Opposition, Dkt. No. 13 at 13–15.

1    defendant because of his disability."  *Arizona ex rel. Goddard v. Harkins*

2    *Amusement Enterprises, Inc*., 603 F.3d 666, 670 (9th Cir. 2010).

3            Title III lists twelve categories of public accommodations, including,

4    *inter alia*, hotels, restaurants, grocery stores, banks, hospitals, schools, and

5    gymnasiums.  42 U.S.C. § 12181(7); *Weyer v. Twentieth Century Fox Film Corp.*,

6    198 F.3d 1104, 1114 (9th Cir. 2000) ("All the items [in the ADA's list of public

7    accommodations] are actual, physical places where goods or services are open to

8    the public, and places where the public gets those goods or services.").  Drawing

9    from this list, the Ninth Circuit has held that, to prevail on a Title III claim, a

10   plaintiff must show "some connection between the good or service complained of

11   and an actual physical place."  *Allen v. Cellco P'ship*, No. 24-4573, 2025 WL

12   1367824, at *1–2 (9th Cir. May 12, 2025) (radio-frequency field was not a public

13   accommodation under Title III because it did not "facilitate[] access to the goods or

14   services of a place of public accommodation").

15           Due to the circumscribed reach of Title III of the ADA, Plaintiff lacks

16   standing to pursue a claim against SAG-AFTRA because he has not demonstrated

17   that he was denied access to a public accommodation.  Plaintiff has not, and indeed

18   cannot, cite any case law to support the contention that SAG-AFTRA's Voter's

19   Guide is a public accommodation.  *See, e.g.*, *Cullen v. Netflix, Inc*., 880 F.Supp.2d

20   1017, 1024 (N.D. Cal. 2012) (holding that Netflix website was not an "actual

21   physical place and therefore, under Ninth Circuit law, [was] not a place of public

22   accommodation" (internal quotations omitted)); *Treanor v. Washington Post Co*.,

23   826 F.Supp. 568, 569–70 (D.D.C. 1993) (a publication is not a place of public

24   accommodation).  Nor has he shown a nexus between the Voter's Guide and an

25   actual physical place.  *See, e.g.*, *Stern v. Sony Corp. of Am*., 459 F. App'x 609, 611

26   (9th Cir. 2011) (allegation that Sony's video games were sufficiently connected to a

27   place of public accommodation was "too tenuous to support a cause of action

28   under the ADA"); *Erasmus v. Chien*, 650 F.Supp.3d 1050, 1060 (E.D. Cal. 2023)

16

(plaintiff did not establish standing where she failed to allege a sufficient nexus between website and health care center); *Gomez v. Miersch*, No. 21-CV-08936-CRB, 2022 WL 1271009, at *2 (N.D. Cal. Apr. 28, 2022) (plaintiff lacked standing for ADA claim where he was "far from pleading a 'nexus'" between a website and place of public accommodation).

Absent a showing that he was denied access to a public accommodation, Plaintiff's ADA claim against SAG-AFTRA is likely to fail for lack of standing. *See Pollara v. Radiant Logistics Inc*., No. CV 12-0344 GAF (SPX), 2012 WL 12887095, at *5 (C.D. Cal. Sept. 13, 2012) (denying preliminary injunction application where plaintiff could not show a likelihood of success on the merits due to lack of standing).

      ii.    *Plaintiff is not likely to succeed on the substantive merits of his disability claims.*

For similar reasons, Plaintiff is not likely to succeed on the substantive merits of his disability claims. The ADA "forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodation (Title III)." *McColm v. Hearst Corp*., No. C01-3266SI, 2001 WL 1112204, at *1 (N.D. Cal. Sept. 17, 2001) (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001)). Plaintiff's ADA claim fails because he has not, and cannot, establish that he has suffered discrimination in employment, public services, or public accommodations. *See id.* (holding that plaintiff failed to state a claim under the ADA where he alleged discrimination by a newspaper company, which did not relate to employment, public services, or public accommodations).

As discussed above, SAG-AFTRA's Voter's Guide is not a place of public accommodation. *See Doe v. CVS Pharmacy, Inc*., 982 F.3d 1204, 1213 (9th Cir. 2020) (affirming dismissal of ADA claim where plaintiffs did not plausibly allege that benefit plan was a place of public accommodation); *Weyer*, 198 F.3d at

17

1114–15 (insurance company that administrated an employer-provided disability plan not a place of public accommodation). SAG-AFTRA is not a public entity, so it cannot be held liable under Title II of the ADA. *See Zimmerman v. Oregon Dep't of Just.*, 170 F.3d 1169, 1180 (9th Cir. 1999) ("Congress did not make private entities subject to Title II . . . ."). And, although Plaintiff does not appear to make a claim under the ADA's employment provision, that claim would fail for the reasons set forth in SAG-AFTRA's Opposition. TRO Opposition at 10–11.

Plaintiff's claims under FEHA and the CDPA similarly fail. Plaintiff's FEHA claim is likely to fail because he does not provide any evidence showing that SAG-AFTRA intentionally discriminated against him or applied its policy in a way that burdens disabled members. *See Lopez v. Pac. Mar. Ass'n*, 657 F.3d 762, 764, 766 (9th Cir. 2011) (affirming dismissal of disability claims brought under FEHA and the ADA and stating "[t]he ADA prohibits employment decisions made because of a person's qualifying disability, not decisions made because of factors merely related to a person's disability"). At most, Plaintiff has demonstrated that SAG-AFTRA cropped one photograph he submitted in adherence with its uniformly followed headshot policy. *Cf. Borodaenko v. Twitter, Inc*., No. 22-CV-07226-HSG, 2023 WL 3294581, at *4 (N.D. Cal. May 5, 2023) (dismissing disability claims brought under the ADA and FEHA and noting "the Court cannot draw an inference of disparity from a single data point").

As for Plaintiff's CDPA claim, like the ADA, the CDPA applies to disabled individuals' access to public places, which is not at issue here. *See* Cal. Civ. Code § 54(a) (outlining a general right for disabled individuals to access public places). And, while Plaintiff cites to CDPA Section 54.2, which establishes a "right to be accompanied by a guide dog" in the physical places enumerated in Section 54.1, *id.* § 54.2(a), cropping Plaintiff's headshot to remove his service dog bears no resemblance to refusing to allow him to be accompanied by his service dog in a public place—which SAG-AFTRA has not done.

18

The cases Plaintiff cites are readily distinguishable on both factual and legal bases. *See, e.g.*, *Alexander v. Choate*, 469 U.S. 287, 302 (1985) (in claim under the Rehabilitation Act, holding that governor of Tennessee did not deny disabled individuals "meaningful access" to Medicaid); *C.R. Educ. & Enf't Ctr. v. Hosp. Props. Tr.*, 867 F.3d 1093, 1097 (9th Cir. 2017) (discussing standing requirements for ADA claim based on deterrence; no dispute hotel was public accommodation); *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1134 (9th Cir. 2012) (dispute of fact as to whether Disney World was required to allow disabled patrons to use Segways at its parks; no dispute that Disney World was a place of public accommodation); *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 955 (9th Cir. 2011) (plaintiff failed to allege an injury-in-fact as to alleged accessibility violations he encountered at a store); *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1082 (9th Cir. 2004) (disabled plaintiff established a claim under the ADA where movie theatre, a place of public accommodation, refused to modify seating policies to prioritize a paraplegic's need to sit next to an aide during movies); *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996) (Hawaii's quarantine requirement for dogs denied visually impaired people access to *state* services, programs, or activities); *Sturgis v. Copiah Cnty. Sch. Dist.*, No. 3:10-CV-455-DPJ-FKB, 2011 WL 4351355, at *2 (S.D. Miss. Sept. 15, 2011) (denying motion to dismiss student's Equal Protection Clause and Title IX claims brought against school district that *entirely omitted* her senior portrait from high school yearbook); *see also* PI Motion at 6 (citing Title VII and the Equal Protection Clause cases); *id.* at 7 (citing Lanham Act cases). Not one of these cases supports the claim that SAG-AFTRA's neutral policy regarding its election publication runs afoul of the ADA or California's disability laws.

At bottom, Plaintiff asks this Court to stretch the meaning of the ADA and parallel state laws beyond their express intended reach. *Cf. Whitaker v. Starbucks Corp.*, No. CV 19-6583-GW-SKX, 2019 WL 13528318, at *4 (C.D. Cal.

19

1   Nov. 25, 2019) (granting motion to dismiss, in part, where "what it appears

2   Plaintiff is attempting to achieve is the institution of a requirement that neither

3   Congress nor those in charge of the accessibility standards have seen fit to legislate

4   or otherwise require").  Because Plaintiff has provided no support that he is likely

5   to succeed on this theory, his PI Motion must fail.

6        iii.    *The Court should decline to exercise supplemental jurisdiction
7                over Plaintiff's state-law claims.*

8          Because Plaintiff has not shown that his ADA claim is likely to

9   succeed on the merits, this Court should not exercise supplemental jurisdiction

10  over his state-law FEHA and CDPA claims.  As set forth above, the Court lacks

11  jurisdiction over Plaintiff's ADA claim due to lack of standing; thus, it cannot

12  exercise supplemental jurisdiction over Plaintiff's state-law claims.  *See Whitaker*

13  *v. Yard House*, No. SACV192290JVSJDEX, 2020 WL 3805807, at *3 (C.D. Cal.

14  Mar. 23, 2020) ("[W]here a Court lacks Article III jurisdiction over a plaintiff's

15  ADA claim for lack of standing, the Court has no discretion to retain supplemental

16  jurisdiction over the plaintiff's remaining state law claims.").  Alternatively, even if

17  the Court determines that Plaintiff likely has standing to pursue his ADA claim,

18  because the ADA claim is patently unmeritorious, it should decline to exercise

19  supplemental jurisdiction over the CDPA and FEHA claims.  *See Oliver v. Ralphs*

20  *Grocery Co.*, 654 F.3d 903, 911 (9th Cir. 2011) (district court did not err when it

21  declined to exercise jurisdiction over state-law claims, including CDPA claim, after

22  dismissing ADA claim); *Miersch*, 2022 WL 1271009, at *3 (N.D. Cal. Apr. 28,

23  2022) (declining to exercise supplemental jurisdiction over state-law disability

24  claim after dismissing ADA claim).

25          At the preliminary injunction stage, the "strong possibility" that the

26  Court will find Plaintiff's ADA claim unmeritorious and later decline to exercise

27  supplemental jurisdiction over his state-law claims prevents Plaintiff from

28  establishing a likelihood of success on the merits.  *See Verse v. Scott*, No. CV-25-

01581-PHX-KML, 2025 WL 1425005, at *3 (D. Ariz. May 16, 2025) (plaintiff failed to show she was likely to succeed on the merits where there was a strong possibility that court would decline to exercise supplemental jurisdiction over any state-law claims); *Carnero v. Elk Grove Fin., LLC*, No. 16-CV-03606-BLF, 2016 WL 6873544, at *3 (N.D. Cal. Nov. 22, 2016) (denying TRO where the plaintiffs had not demonstrated a likelihood of success on the merits of their federal claim and declining to exercise supplemental jurisdiction over state-law claims).

### C.    The public interest and balance of equities weigh against injunctive relief.

Finally, as discussed in SAG-AFTRA's TRO Opposition, Plaintiff fails to establish the last two factors necessary to obtain injunctive relief: a showing that an injunction serves the public interest and that the balance of equities tips in his favor.  *Winter*, 555 U.S. at 20; TRO Opposition at 15–17.

*First*, Plaintiff has not shown that an injunction is in the public interest.  The public, alongside SAG-AFTRA, has a strong interest in ensuring compliance with federal law surrounding internal union elections.  These laws vindicate members' rights to select representatives of their choosing to lead their unions, without judicial intervention.  *See Calhoon v. Harvey*, 379 U.S. 134, 140 (1964)*.*  By the same token, there is a strong public interest in allowing a union to manage its internal affairs.  *See Am. Fed'n of State Cnty. & Mun. Emps. v. United Domestic Workers of Am.*, No. 05CV1251BTM(POR), 2005 WL 8173329, at *11 (S.D. Cal. June 30, 2005) (citing favorably a case holding that judicial non-interference in union affairs fosters the public interest).

To that end, in addition to providing an internal union process for protesting and adjudicating issues that arise in an election, SAG-AFTRA considers recommendations from members for changes to its policies and procedures for future election cycles.  *See* Bennett Decl. ¶¶ 19–20, Ex. M at M-3.  Consistent with this, SAG-AFTRA has agreed to consider Plaintiff's recommendation that it allow

disabled members to submit photographs with service animals for inclusion in the Voter's Guide in future election cycles. *Id.* It cannot, however, disregard its codified internal procedures at this late stage in the election process.

          *Second*, for similar reasons, the balance of equities overwhelmingly favors SAG-AFTRA. At the time of filing this brief, the LA Election will conclude in one week, on September 12, 2025. More than 100 candidates are featured in the Voter's Guide, and more than 50,000 LA Local members are eligible to vote in the Local's election. Bennett Decl. ¶ 12. These candidates and members have operated pursuant to the established rules in the Election Policy and Candidate Instructions—which have been in effect for seven election cycles—as well as the LA Election Committee's approval of the uniform cropping practice, a decision that, under the LA Local Constitution, was "final." Bennett Decl. ¶¶ 13–17. At this juncture—because the election will conclude on September 12th—granting the requested relief will require setting aside the election results and ordering a re-run election, a remedy exclusively within the jurisdiction of the SAG-AFTRA Election Committee, which is appealable to the Department of Labor. Thus, any change to the union's policies should come not via judicial intervention but through the union's own internal processes. *See United Steelworkers of Am. v. Sadlowski*, 457 U.S. 102, 117 (1982) ("[G]reat care should be taken not to undermine union self-government.").

## CONCLUSION

          For all the foregoing reasons, the Court should deny Plaintiff's Motion for a Preliminary Injunction.

Dated:      September 5, 2025
            New York, New York

                              Respectfully submitted,

                              /s/ Olivia R. Singer
                              Susan Davis (*pro hac vice* admitted)
                              Olivia R. Singer (Calif. Bar No.
                              312770)
                              Kayla Morin (*pro hac vice* admitted)
                              COHEN, WEISS and SIMON LLP
                              909 Third Avenue, 12th Floor
                              New York, New York 10022-4869
                              Tel: (212) 563-4100
                              sdavis@cwsny.com
                              *Attorneys for Defendant SAG-AFTRA*

23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 11-6.2 of the United States District Court for the Central District of California, the undersigned, counsel of record for Defendant SAG-AFTRA, certifies that this brief contains 6,913 words, which complies with the word limit of L.R. 11-6.1.

Dated:          September 5, 2025
                New York, New York


                                        */s/ Olivia R. Singer*